**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

In Re: LECKIE SMOKELESS COAL
COMPANY; NEW RIVER MINERAL
RESOURCES COMPANY; GOULD
RESOURCES, INCORPORATED,
Debtors.

UNITED MINE WORKERS OF AMERICA
1992 BENEFIT PLAN, and its
Trustees; UNITED MINE WORKERS OF
AMERICA COMBINED BENEFIT FUND,
and its Trustees,
Movants-Appellants,

                                           No. 96-1708

v.

LECKIE SMOKELESS COAL COMPANY;
NEW RIVER MINERAL RESOURCES
COMPANY; GOULD RESOURCES,
INCORPORATED; ROYAL SCOT
MINERALS, INCORPORATED,
Defendants-Appellees,

and

UNSECURED CREDITORS COMMITTEE;
OFFICE OF THE UNITED STATES
TRUSTEE,
Parties-in-Interest.

In Re: LECKIE SMOKELESS COAL
COMPANY; NEW RIVER MINERAL
RESOURCES COMPANY; GOULD
RESOURCES, INCORPORATED,
Debtors.

UNITED MINE WORKERS OF AMERICA
1992 BENEFIT PLAN, and its
Trustees; UNITED MINE WORKERS OF
AMERICA COMBINED BENEFIT FUND,
and its Trustees,
Movants-Appellants,

v.                                                              No. 96-1849

LECKIE SMOKELESS COAL COMPANY;
NEW RIVER MINERAL RESOURCES
COMPANY; GOULD RESOURCES,
INCORPORATED; ROYAL SCOT
MINERALS, INCORPORATED,
Defendants-Appellees,

and

UNSECURED CREDITORS COMMITTEE;
UNITED STATES TRUSTEE,
Parties-in-Interest.

Appeals from the United States District Court
for the Southern District of West Virginia, at Beckley.
Elizabeth V. Hallanan, District Judge.
(CA-96-92-5)

2

In Re: LADY H COAL COMPANY,
INCORPORATED; CONSOLIDATED
SEWELL, INCORPORATED; SEWELL COAL
COMPANY; LEIVASY MINING
CORPORATION; EASTWOOD
CONSTRUCTION, INCORPORATED,
Debtors.

LADY H COAL COMPANY,
INCORPORATED; CONSOLIDATED
SEWELL, INCORPORATED; SEWELL COAL
COMPANY; LEIVASY MINING
CORPORATION; EASTWOOD
CONSTRUCTION, INCORPORATED,
Debtors-Appellees,

v.

UNITED MINE WORKERS OF AMERICA
1992 BENEFIT PLAN, and its
Trustees,
Movant-Appellant,

and

UNITED MINE WORKERS OF AMERICA
COMBINED BENEFIT FUND, and its
Trustees,
Movant,

and

INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA; DISTRICT 17,
UNITED MINE WORKERS OF AMERICA,
Parties-in-Interest.

No. 96-1739

3

In Re: LADY H COAL COMPANY,
INCORPORATED; CONSOLIDATED
SEWELL, INCORPORATED; SEWELL COAL
COMPANY; LEIVASY MINING
CORPORATION; EASTWOOD
CONSTRUCTION, INCORPORATED,
Debtors.

LADY H COAL COMPANY,
INCORPORATED; CONSOLIDATED
SEWELL, INCORPORATED; LEIVASY
MINING CORPORATION; EASTWOOD

CONSTRUCTION, INCORPORATED,
Debtors-Appellees,

v.

UNITED MINE WORKERS OF AMERICA
1992 BENEFIT PLAN, and its
Trustees,
Movant-Appellant,

and

INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA; DISTRICT 17,
UNITED MINE WORKERS OF AMERICA,
Parties-in-Interest.

No. 96-1850

Appeals from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, Chief District Judge.
(MC-96-33-2, BK-94-20449, BK-94-20765, BK-94-20766,
BK-94-20767, BK-94-20710)

Argued: July 18, 1996

Decided: October 29, 1996

Before MURNAGHAN and ERVIN, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by published opinion. Judge Murnaghan wrote the opinion,
in which Judge Ervin and Senior Judge Phillips joined.

_____

**COUNSEL**

**ARGUED:** Jami Wintz McKeon, MORGAN, LEWIS & BOCKIUS,
Philadelphia, Pennsylvania, for Appellants. Ellen S. Cappellanti,
JACKSON & KELLY, Charleston, West Virginia; John Allen Rol-
lins, LEWIS, FRIEDBERG, GLASSER, CASEY & ROLLINS,
Charleston, West Virginia, for Appellees. **ON BRIEF:** Marilyn L.
Baker, MOONEY, GREEN, BAKER, GIBSON & SAINDON, P.C.,
Washington, D.C.; Larry D. Newsome, Barbara Locklin-George,
Office of the General Counsel, UMWA HEALTH & RETIREMENT
FUNDS, Washington, D.C., for Appellants. Ethan D. Fogel,
Joseph A. O'Connor, DECHERT, PRICE & RHOADS, Philadelphia,
Pennsylvania; Stephen L. Thompson, BARTH, THOMPSON &
GEORGE, Charleston, West Virginia, for Appellees.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

Appellants in these consolidated cases are the 1992 UMWA Bene-
fit Plan and the UMWA Combined Benefit Fund, both of which were
established pursuant to the Coal Industry Retiree Health Benefit Act
of 1992, 26 U.S.C. §§ 9701-9722. Appellees are coal operators that
have filed voluntary petitions for bankruptcy relief and that have
asked the Bankruptcy Court to declare that the purchasers of their
assets will not be jointly and severally liable, as their successors in
interest, for their financial obligations to the Plan and the Fund. The
district courts held that the purchasers of Appellees' assets would not
be Appellees' successors in interest within the meaning of the Coal

5

Act and therefore authorized the Bankruptcy Court to permit the sales free and clear of Appellees' Coal Act liabilities. In the second of the two cases before us, the District Court held, in the alternative, that, even if the purchasers of the debtors' assets would be the debtors' successors in interest, the Bankruptcy Court could extinguish all successor liabilities arising under the Coal Act by entering a free and clear order pursuant to 11 U.S.C. § 363(f)(5). On the strength of the latter line of reasoning, and without reaching the question of whether the purchasers would be Appellees' successors in interest, we affirm the judgments of the district courts.

I.

The events spurring the enactment of the Coal Act have been described elsewhere, see, e.g., Blue Diamond Coal Co. v. Shalala (In re Blue Diamond Coal Co.), 79 F.3d 516, 518-20 (6th Cir. 1996); Davon, Inc. v. Shalala, 75 F.3d 1114, 1117-19 (7th Cir. 1996), pets. for cert. filed, 64 U.S.L.W. 3741, 3742 (Apr. 22 & 23, 1996); LTV Steel Co. v. Shalala (In re Chateaugay Corp. ), 53 F.3d 478, 481-86 (2d Cir.), cert. denied, ___ U.S. #6D 6D6D#, 116 S. Ct. 298 (1995), and need not be thoroughly recounted here. In short, the pertinent facts are these. Beginning in 1946, coal miners received pension and health benefits pursuant to a series of employer-funded plans negotiated by their union, the United Mine Workers of America ("UMWA"), and the Bituminous Coal Operators Association ("BCOA"). LTV Steel Co., 53 F.3d at 481-85. From 1974 until 1978, non-pension benefits were provided under two plans--the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan--with the former providing benefits to miners who retired prior to January 1, 1976, and the latter providing benefits to miners who retired after that date. Id. at 482. In 1978, the UMWA and BCOA agreed partially to decentralize the scheme: they agreed that each miner retiring after January 1, 1976, would receive health benefits pursuant to a plan created and funded by his or her last employer, and that the 1974 UMWA Benefit Plan would provide health benefits only to those retirees who had been "orphaned"--that is, those retirees whose last employer had gone out of business. Id. at 482-83.

In the 1980s, the 1950 and 1974 plans began to face serious financial difficulties: the number of employers contributing to the plans

declined, the number of orphaned miners increased, and the costs of health care soared. Id. at 483-84. Congress responded in 1992 by enacting the Coal Industry Retiree Health Benefit Act of 1992, Pub. L. No. 102-486, 106 Stat. 2776, 3036-56 (codified at 26 U.S.C. §§ 9701-9722). The overarching purpose of the Act was to establish a system whereby each current and former signatory operator--that is, each operator that "is or was a signatory to a coal wage agreement," as such agreements are defined in section 9701(b)(1) of the Act, see § 9701(c)(1)--is required to pay for the benefits provided to its own retirees and to share in the cost of providing benefits to orphaned retirees.[1] LTV Steel Co., 53 F.3d at 485. Toward that end, Congress created two new benefit plans.

First, it established the UMWA Combined Benefit Fund ("the Fund") by merging the 1950 UMWA Benefit Plan and the 1974 UMWA Benefit Plan. See 26 U.S.C. § 9702(a). The Fund provides health and death benefits to coal industry retirees who, as of July 20, 1992, were eligible for, and receiving, benefits under either the 1950 or the 1974 plan. Id. § 9703(a), (f). The Fund is financed by annual per-beneficiary premiums paid in monthly installments by "assigned operators." Id. §§ 9704, 9706; see id. § 9701(c)(5) ("defining"assigned operator"); id. § 9706(a) (describing the manner in which beneficiaries are assigned to operators). An assigned operator's "related persons" are jointly and severally liable for the operator's premiums. Id. §§ 9704(a). An entity is deemed a person related to an operator if it is

> (i) a member of the controlled group of corporations . . . which includes such signatory operator;

---

[1] Congress found that,

> in order to secure the stability of interstate commerce, it is necessary to modify the current private health care benefit plan structure for retirees in the coal industry to identify persons most responsible for plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to such retirees.

Pub. L. No. 102-486, 106 Stat. 2776, 3037.

7

> (ii) a trade or business which is under common control . . .
> with such signatory operator; or
>
> (iii) any other person who is identified as having a partner-
> ship interest or joint venture with a signatory operator
> in a business within the coal industry, but only if such
> business employed eligible beneficiaries . . . .

Id. § 9701(c)(2). An entity is also an operator's "related person" if it is a "successor in interest of any person described in clause (i), (ii), or (iii)." Id. The Act does not define the phrase "successor in interest."

Second, Congress established the 1992 UMWA Benefit Plan ("the Plan"). Id. § 9712(a). The Plan provides health benefits to retirees who retired prior to September 30, 1994, and who, among other things, are not eligible to receive benefits from the Combined Benefit Fund. Id. § 9712(b). The Plan is financed by annual and monthly premiums paid by the beneficiaries' "last signatory operators."[2] Id. § 9712(d)(1), (3). An operator's "successor in interest" and "related persons" are jointly and severally liable for the operator's premiums. Id. §§ 9711(g)(1), 9712(d)(4).

II.

The instant appeals concern two separate cases arising from the Southern District of West Virginia. The pertinent facts concerning those cases are as follows.

A. UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co.

Appellees in the first of the two cases before us are Leckie Smoke-less Coal Company, the New River Mineral Resources Company, and Gould Resources, Inc. Until January 1994, Leckie conducted coal mine operations in West Virginia. New River and Gould are affiliates of Leckie that own leases of coal lands located adjacent to Leckie's

_____

[2] The Act imposes differing liabilities upon "1988 last signatory opera-tors," see 26 U.S.C. § 9712(d)(1), and upon all other last signatory opera-tors, see id. § 9712(d)(3); see also id. § 9701(c)(3) (defining the term "1988 agreement operator").

property. Together, the three companies have been assigned 140 beneficiaries for purposes of Combined Benefit Fund liability and, with respect to the 1992 UMWA Benefit Plan, are the last signatory employers of 87 retirees. Leckie has stated that its total Coal Act liabilities exceed $7 million and that its monthly premiums exceed $60,000.

Appellees have each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.**3** Joseph C. Turley III, president of each of the three companies, wishes to sell Appellees' assets pursuant to 11 U.S.C. §§ 363, 365 to Royal Scot Minerals, Inc., for approximately $1.9 million. As a condition of the purchase, Royal Scot has insisted that it take Appellees' property "free and clear" of all successor liabilities that might arise under the Coal Act. See 11 U.S.C. § 363(f) (stating the conditions under which a trustee may sell property "free and clear of any interest in such property of an entity other than the estate").

After Appellees filed a motion with the Bankruptcy Court seeking permission to sell their assets to Royal Scot free and clear of such liabilities, an objection to the motion was filed by Appellants--the 1992 UMWA Benefit Plan and its Trustees and the UMWA Combined Benefit Fund and its Trustees. The Plan and Fund contended that the Bankruptcy Court could not extinguish successor liabilities arising under the Coal Act. On the Plan and Fund's motion, the objection was withdrawn from the Bankruptcy Court's consideration by Judge Elizabeth V. Hallanan of the Beckley Division of the United States District Court for the Southern District of West Virginia. See 28 U.S.C. § 157(d) ("The district court shall, on timely motion of any party, . . . withdraw a proceeding [from a bankruptcy court] if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.").

The District Court held that (1) based upon the meaning of the phrase "successor in interest" as it is used in one of the implementing regulations of the Internal Revenue Code, see 26 C.F.R. § 1.1503-

_____

**3** Leckie filed on April 16, 1993; New River filed on November 13, 1995; and Gould filed on November 17, 1995.

9

2(c)(12), Royal Scot would not be Appellees' successor in interest within the meaning of the Coal Act because Royal Scot would not inherit Appellees' tax attributes merely by purchasing their assets; (2) Royal Scot therefore could not be held liable for Appellees' Coal Act obligations; and (3) section 363(f)(1) of the Bankruptcy Code therefore authorized the Bankruptcy Court to permit the sale of Appellees' assets free and clear of their Coal Act obligations. **4** See 11 U.S.C. § 363(f)(1) (stating that a trustee may sell property free and clear of an interest in that property when "applicable nonbankruptcy law" so permits). The court concluded by making the following observations:

> If the proposed sale between Defendants [Appellees] and the Buyer goes through, although the Buyer will not be contributing the Defendants' future obligations to the Funds, jobs will be created when the property is mined again and funds will be generated from which to pay some of Defendants' debts, including their past due Coal Act obligations. If the sale does not go through, no one will be in a position to contribute Defendants' future obligations to the Funds, no jobs will be created, and Defendants' debts will not be paid, at least not until Defendants' assets are sold in a piecemeal fashion, possibly generating less value than a sale such as this of all of Defendants' assets. The Court believes the lesser of these evils is the greater good.

On April 29, 1996, the District Court issued a supplemental order, ruling that its decision involved "a controlling question of law as to which there is substantial ground for difference of opinion and immediate appeal may materially advance the ultimate termination of the litigation." See 28 U.S.C. § 1292(b).

On May 2, 1996, the Bankruptcy Court ruled that the terms of the proposed sale were "fair and reasonable" and authorized the sale of Appellees' assets free and clear of their Coal Act liabilities. Royal

_____

**4** The district court also held that the proposed sale to Royal Scot was neither a bad-faith transaction within the meaning of section 363(m) of the Bankruptcy Code nor a "sham transaction" within the meaning of section 9722 of the Coal Act. The Plan and Fund have not appealed those rulings.

10

Scot, Appellees, the Fund, and the Plan have agreed that Appellees and Royal Scot will not close the sale until after the earlier of (1) fourteen days after the issuance of our opinion in the instant cases and (2) October 1, 1996.

B. <u>1992 UMWA Benefit Plan v. Lady H Coal Co.</u>

Appellees in the second of the two cases before us are the Lady H Coal Company, Inc., Consolidated Sewell, Inc., Sewell Coal Company, Leivasy Mining Corporation, and Eastwood Construction, Inc.**5** Appellees, each of whom operated coal mines in West Virginia, have filed voluntary petitions for bankruptcy relief under Chapter 11.**6** With respect to the 1992 UMWA Benefit Plan, the five debtors are the last signatory employers of approximately 150 retirees.

Appellees filed a motion with the Bankruptcy Court seeking permission to auction their property, with the buyer or buyers taking the property free and clear of liens and encumbrances. Objections to the motion were filed by Appellant, the 1992 UMWA Benefit Plan, and by the United Mine Workers of America, International.**7** The Plan contended that property cannot be sold in a bankruptcy auction free and clear of obligations arising under the Coal Act, and filed a motion to withdraw the matter from the Bankruptcy Court's consideration pursuant to 28 U.S.C. § 157(d). Chief Judge Charles H. Haden II, of the Charleston Division of the United States District Court for the Southern District of West Virginia, denied the motion to withdraw, but directed the Bankruptcy Court to submit proposed findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c) concerning the Plan's objections to the proposed sale. The Bankruptcy Court did so on March 29, 1996.

_____

**5** Consolidated is the parent corporation of Lady H and Sewell. Leivasy and Eastwood are Lady H's subsidiaries.

**6** Lady H filed on July 20, 1994; Eastwood filed on November 7, 1994; Leivasy filed on December 2, 1994; and Consolidated and Sewell filed on December 22, 1994.

**7** The UMWA is not a party to the instant appeal. We therefore need consider neither the union's objections to the proposed auction nor the District Court's reasons for overruling those objections.

11

Upon receiving the Bankruptcy Court's proposed findings, the District Court held that Judge Hallanan's opinion in Leckie Smokeless was "binding precedent and . . . resolve[d] the objections filed by the 1992 Plan" and overruled the Plan's objections accordingly. The court noted that, in its proposed conclusions of law, the Bankruptcy Court had reached a conclusion similar to that reached by Judge Hallanan, and ruled that, under principles of stare decisis, it should adopt the Leckie Smokeless reasoning. The court further stated, though, that, "[s]hould Judge Hallanan revisit her Order, or should that Order meet with less than full agreement from the Court of Appeals, the Court would adopt in the alternative [the Bankruptcy Court's] fine analysis." The Bankruptcy Court had suggested that, even if the purchasers of Appellees' assets would be Appellees' successors in interest, the Bankruptcy Court had the power under section 363(f)(5) of the Bankruptcy Code to issue a free and clear order absolving the purchasers of successor liabilities arising under the Coal Act. See 11 U.S.C. § 363(f)(5) (stating that a trustee may sell property free and clear of an interest in that property when the holder of the interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest").

On May 6, 1996, the District Court issued a supplemental order pursuant to section 1292(b), similar to the supplemental order that had been issued by the District Court in Leckie Smokeless.

On May 10, 1996, the Bankruptcy Court ruled that a bid of $4.5 million submitted by the Green Valley Coal Company was "fair and reasonable" and authorized the sale of Appellees' assets free and clear of their Coal Act obligations. The transaction was subsequently executed. The parties have placed a portion of the sale proceeds into an escrow account, the disposition of which depends upon the outcome of the instant appeal.

C. Consolidation of the Appeals

On June 18, 1996, after the Plan and Fund timely appealed the district courts' rulings, we issued an order consolidating the two cases, granting Appellants' request to make interlocutory appeals, and expediting those appeals. The Plan and Fund believe that the district courts lacked jurisdiction to authorize sales free and clear of Appellees' Coal

12

Act liabilities, and that the district courts erred when they held that the purchasers of Appellees' assets would not become, by making such purchases, Appellees' successors in interest within the meaning of the Coal Act. The Plan also has taken the position that the District Court in Lady H erred when it held, in the alternative, that, even if the purchaser of the debtors' assets would become the debtors' successor in interest, the Bankruptcy Court could extinguish that successor liability by issuing a free and clear order pursuant to 11 U.S.C. § 363(f)(5).

III.

The Plan and Fund have argued that the district courts lacked subject matter jurisdiction to determine whether the purchasers of Appellees' assets could take those assets free and clear of Coal Act successor liabilities. They have rested that argument upon the following contentions: (1) that the Plan and Fund do not have "claims" within the meaning of section 101(5)(A) of the Bankruptcy Code; (2) that the eight debtors have not sought approval of the sale of assets free and clear of "interests in property" within the meaning of section 363(f) of the Code; and (3) that the district courts were asked to issue declaratory judgments that restrain the assessment and collection of taxes.**8**

_____

**8** The Plan and Fund have also argued (1) that the debtors lacked standing to ask the courts to declare that the purchasers of their assets would not be jointly and severally liable for their Coal Act obligations and (2) that the issues raised in the instant appeals were not yet ripe for adjudication. Applying the standards articulated in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (concerning standing), and Charter Federal Sav. Bank v. Office of Thrift Supervision, 976 F.2d 203, 208 (4th Cir. 1992) (concerning ripeness), cert. denied, 507 U.S. 1004 (1993), we have concluded that those arguments are without merit. With respect to standing, the debtors are confronted with the imminent loss of all or a portion of what the Bankruptcy Court has found to be fair and reasonable value for their assets; the cause of that imminent injury is the threat of Coal Act successor liability; and the imminent injury will be redressed if we affirm the district courts' rulings that the debtors' assets may be sold free and clear of the debtors' Coal Act liabilities. With respect to ripeness, no further factual developments are needed to determine whether the Bankruptcy Court may presently extinguish Coal Act successor liabilities, and prompt resolution of the bankruptcy proceedings requires that the successorship matter be resolved sooner, rather than later.

13

A. <u>Claims</u>

The Bankruptcy Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). By defining the term so broadly, Congress intended that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 309 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963, 6266.

The Plan and Fund have argued that, because future Coal Act premiums have not yet been assessed, liability for those premiums does not yet exist, the Plan and Fund therefore cannot now assert claims to those premiums, and the district courts therefore cannot now issue orders concerning liability for those premiums. Appellants rely principally upon the Second Circuit's decision in <u>LTV Steel Co.</u> and upon our decision in <u>River Place East Housing Corp. v. Rosenfeld</u> (<u>In re Rosenfeld</u>), 23 F.3d 833 (4th Cir.), <u>cert. denied</u>, ___ U.S. ___, 115 S. Ct. 200 (1994). Finding both cases distinguishable, we reject Appellants' argument.

In <u>LTV Steel Co.</u>, the Second Circuit observed that "it is clear that the existence of a valid bankruptcy claim depends on (1) whether the claimant possessed a right to payment, and (2) whether that right arose before the filing of the petition." 53 F.3d at 497. The court then rejected the debtor coal operator's argument that its obligations to the Combined Benefit Fund "constitute[d] pre-petition debts which must . . . be disallowed because no timely proof of claim was filed." <u>Id</u>. at 496-97. The court held that the Fund did not have a pre-petition right to premium payments because (1) the Coal Act was not enacted until six years <u>after</u> the debtor filed its petition for bankruptcy relief and (2) "where the statute imposing the liability has not been enacted, it would be impossible to find even the remotest `right to payment.'" <u>Id</u>. at 497 (internal quotation omitted). In the cases at bar, the Coal Act was enacted prior to the dates on which the debtors filed for bankruptcy relief. Moreover, at the time those petitions were filed, it was established that, absent a change in the law, the debtors would be liable for future Coal Act premiums, the amount of which would be

14

determined from time to time in accordance with the formulae described in the statute.

In River Place, we were asked to determine"whether a discharge in bankruptcy relieves a debtor from personal liability for post-petition assessments of cooperative housing dues." 23 F.3d at 835. We answered that question in the negative, holding that the cooperative association's claim "arose from [the debtor's] continued post-petition ownership of the property and not from a pre-petition contractual obligation." Id. at 837. In the instant cases, the debtors' liability for Coal Act premiums has arisen from their pre-petition, rather than their post-petition, acts.**9**

In accordance with Congress's desire that we interpret the term "claim" broadly, and in light of the statute's express indication that even unmatured and contingent rights to payment are to be regarded as claims, we hold that the Plan and Fund do have claims to future premium payments.

_____

**9** The extent to which the debtors' liability for future Coal Act premiums was fixed at the time they filed their bankruptcy petitions--even though the amount of those premiums could not then and still cannot be precisely stated--is exemplified by the Coal Act's provisions concerning the effect of a coal operator's decision to leave the coal-mining industry on that operator's subsequent liability for Coal Act premiums. It appears that a coal operator remains liable for both Fund and Plan premiums even if it chooses to cease coal mining operations and to take up an entirely different enterprise. See 26 U.S.C. § 9701(c)(7) (defining "in business" as being engaged in any business activity, "whether or not in the coal industry"); id. § 9706(a) (stating that, with respect to the Fund, retirees are to be assigned to signatory operators that "remain[ ] in business"); id. § 9712(d) (stating that, with respect to the Plan, "all" last signatory operators are responsible for paying premiums); Holland v. Double G Coal Co., 898 F. Supp. 351, 354-55 (S.D. W. Va. 1995) (observing that section 9712(d) does not expressly limit liability to operators that remain in business and concluding that "Congress must have intended section 9712 of the Coal Act to apply to all 1988 last signatory operators, whether or not they remain in business").

15

B. Interests in Property

Section 363(f) of the Bankruptcy Code authorizes the bankruptcy courts, under any one of five prescribed conditions, to authorize the sale of property "free and clear of any interest in such property of an entity other than the estate."[10] 11 U.S.C. § 363(f) (emphasis added). The Code does not define the kinds of interests in property that the statute is intended to encompass. The Plan and Fund have contended, though, that their respective interests in receiving premium payments are not within the scope of the statute:

> Coal Act obligations are not in the nature of an encumbrance on property of the debtor, nor are they enforceable through an in rem action, nor do they arise from ownership of property. Those obligations, therefore, cannot be subject to a free and clear sale under Section 363(f).

Appellants' Brief at 27.

In Leckie Smokeless, citing WBQ Partnership v. Virginia Dep't of Medical Assistance Servs. (In re WBQ Partnership), 189 B.R. 97, 105 (Bankr. E.D. Va. 1995), the District Court stated that "[a] creditor has an `interest in the property' of a debtor when he has a right to seek a future money payment from the debtor." Because the Fund and Plan have a right to seek Coal Act premiums from the debtors, the court concluded that the Fund and Plan have interests in the debtors' prop-

_____

[10] In Leckie Smokeless, the District Court held that the first of the five alternative bases for issuing a free and clear order applied: the court held that nonbankruptcy law--namely, the Coal Act--permitted the sale of the debtors' assets free and clear of Coal Act liabilities. See 11 U.S.C. § 363(f)(1) (stating that a trustee may sell property free and clear of an interest in that property if "applicable nonbankruptcy law permits sale of such property free and clear of such interest"). In Lady H, the District Court found itself bound by the Leckie Smokeless decision. In the alternative, the Lady H court adopted the Bankruptcy Court's proposed finding that the debtors' property could be sold free and clear of the Plan's interest because the Plan "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." See 11 U.S.C. § 363(f)(5). The Plan has not appealed that aspect of the Lady H court's alternative ruling.

16

erty. In <u>Lady H</u>, the District Court did not expressly address the issue; instead, it adopted the Bankruptcy Court's conclusion that the Plan has an interest in the debtors' property and that its claim for premiums would attach to the proceeds of the sale of that property.

Though courts have not yet settled upon a precise definition of the phrase "interest in such property," <u>see Ninth Ave. Remedial Group v. Allis-Chalmers Corp.</u>, 195 B.R. 716, 730-32 (Bankr. N.D. Ind. 1996), we find that the District Court in <u>Leckie Smokeless</u> applied an unduly broad interpretation of the statute when it stated that one has an interest in a debtor's property simply when one has a right to demand money from the debtor. We have previously observed, for example, that "courts have recognized that general, unsecured claims do not constitute `interests' within the meaning of§ 363(f)." <u>Yadkin Valley Bank & Trust Co. v. McGee</u> (<u>In re Hutchinson</u> ), 5 F.3d 750, 756 n.4 (4th Cir. 1993); <u>see also Ninth Ave. Remedial Group</u>, 195 B.R. at 729-32 (observing that a few courts have held that section 363(f) applies only to <u>in rem</u> interests, while numerous other courts have interpreted the statute more broadly, applying it, for example, to product liability and employment discrimination claims). Yet while the plain meaning of the phrase "interest in such property" suggests that not all general rights to payment are encompassed by the statute, Congress did not expressly indicate that, by employing such language, it intended to limit the scope of section 363(f) to <u>in rem</u> interests, strictly defined, and we decline to adopt such a restricted reading of the statute here. <u>Accord P.K.R. Convalescent Centers v. Commonwealth of Virginia, Dep't of Medical Assistance Servs.</u> (<u>In re P.K.R. Convalescent Centers</u>), 189 B.R. 90, 92-94 (Bankr. E.D. Va. 1995) (holding that section 363(f) permitted a sale free and clear of Virginia's depreciation-recoupment interest in the debtor's property, even though that interest was unsecured by lien or otherwise). <u>Contra Fairchild Aircraft Corp. v. Cambell</u> (<u>In re Fairchild Aircraft Corp.</u>), 184 B.R. 910, 917-19 (Bankr. W.D. Tex. 1995) (holding that section 363(f) applies only to "<u>in rem</u> interests which have attached to the property," by way of either "the debtor's consent to a security interest or the creditor's attachment of the property resulting in a lien").

It is difficult to make further categorical observations concerning the intended meaning of the words "interest in"--indeed, the precise boundaries of the phrase likely will be defined only as the courts con-

17

tinue to apply it to the facts presented in the cases brought before them. Yet we hold that the Fund's and Plan's rights to collect premium payments from Appellees constitute interests in the assets that Appellees now wish to sell, or have sold already. Those rights are grounded, at least in part, in the fact that those very assets have been employed for coal-mining purposes: if Appellees had never elected to put their assets to use in the coal-mining industry, and had taken up business in an altogether different area, the Plan and Fund would have no right to seek premium payments from them. Because there is therefore a relationship between (1) the Fund's and Plan's rights to demand premium payments from Appellees and (2) the use to which Appellees put their assets, we find that the Fund and Plan have interests in those assets within the meaning of section 363(f).**11**

C. <u>Declaratory Judgments and Injunctions</u>

The Plan and Fund have argued that the district courts were stripped of subject matter jurisdiction by both the Anti-Injunction Act, 26 U.S.C. § 7421, and the tax-exclusion provision of the Declaratory Judgment Act, 28 U.S.C. § 2201.

The Declaratory Judgment Act authorizes all United States courts to issue declaratory relief in cases within their jurisdiction "except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1986 [or] a proceeding under section 505 or 1146 of title 11." 28 U.S.C. § 2201(a). The Anti-Injunction Act states that, with certain exceptions,"no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).

_____

**11** We emphasize, though, that the question of whether the Plan and Fund have interests in the debtors' property within the meaning of the Bankruptcy Code is distinct from the question of whether third parties become the debtors' successors in interest within the meaning of the Coal Act upon purchasing that property. We express no opinion concerning the latter inquiry.

18

As a preliminary matter, we note that the tax-exclusion provision of the Declaratory Judgment Act cannot be regarded as a jurisdictional bar, per se, because "[t]he Act does not itself confer subject matter jurisdiction, but, rather, makes available an added anodyne for disputes that come within the federal courts' jurisdiction on some other basis." Ernst & Young v. Depositors Economic Protection Corp., 45 F.3d 530, 534 (1st Cir. 1995); accord Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-72 (1950). We will therefore proceed under the assumption that Appellants believe that the Anti-Injunction Act posed a jurisdictional bar, while the Declaratory Judgment Act prohibited the issuance of declaratory relief.

To determine whether the two statutes apply in the instant cases, we must first determine whether Coal Act premiums are taxes. We hold that they are. In United States v. City of Huntington, W. Va., 999 F.2d 71 (4th Cir. 1993), cert. denied, #6D 6D6D# U.S. ___, 114 S. Ct. 1048 (1994), we ascertained whether a service fee imposed by a city was a tax by asking whether it had each of four features: "(a) An involuntary pecuniary burden, regardless of name, laid upon individuals or property; (b) Imposed by or under authority of the legislature; (c) For public purposes, including the purposes of defraying expenses of government or undertakings authorized by it; (d) Under the police or taxing power of the state." Id. at 73 nn.4 & 5 (quoting County Sanitation Dist. No. 2 of Los Angeles County v. Lorber Industries of California (In re Lorber Industries of California), 675 F.2d 1062, 1066 (9th Cir. 1982)); accord Williams v. Motley, 925 F.2d 741, 742 (4th Cir. 1991) ("In the absence of a statutory definition, the Supreme Court has defined taxes as `pecuniary burdens laid upon individuals or their property, regardless of their consent, for the purpose of defraying the expenses of government or of undertakings authorized by it.'") (quoting City of New York v. Feiring, 313 U.S. 283, 285 (1941)). Applying that four-part test, the Second Circuit in LTV Steel Co. held that Coal Act premiums are taxes within the meaning of a priority provision of the Bankruptcy Code: they are involuntary pecuniary burdens imposed by Congress for the public purpose of restoring financial stability to coal miners' benefit plans, and those burdens have been imposed as an exercise of Congress's taxing power. **12** 53 F.3d at 498.

_____

**12** With respect to the last of the four elements, the court pointed out that the Coal Act was enacted as an amendment to the Internal Revenue Code of 1986 and that Congress conferred enforcement powers upon the Secretary of the Treasury. 53 F.3d at 498; see 26 U.S.C. § 9707(d)(1).

19

Finding the Second Circuit's reasoning persuasive, and discerning no basis for distinguishing the meaning of the word "tax" in the Bankruptcy Code from the use of that term in the two statutes at issue before us, we adopt the Second Circuit's reasoning as our own.

We must next determine whether the Anti-Injunction Act or the Declaratory Judgment Act barred the district courts from issuing the orders challenged here. We hold that they did not.

Though the Anti-Injunction Act concerns federal courts' subject matter jurisdiction and the tax-exclusion provision of the Declaratory Judgment Act concerns the issuance of a particular remedy, the two statutory texts are, in underlying intent and practical effect, coextensive. Wyoming Trucking Ass'n v. Bentsen, 82 F.3d 930, 932-33 (10th Cir. 1996)[13]; Perlowin v. Sassi, 711 F.2d 910, 911 (9th Cir. 1983) (per curiam) (stating that "[i]f [a] suit is allowed under the Anti-Injunction Act, it is not barred by the Declaratory Judgment Act"); Investment Annuity, Inc. v. Blumenthal, 609 F.2d 1, 4 (D.C. Cir. 1979), cert. denied, 446 U.S. 981 (1980); Tomlinson v. Smith , 128 F.2d 808, 811 (7th Cir. 1942). The tax-exclusion provision was in fact added to the Declaratory Judgment Act in order to reaffirm the restrictions declared in the Anti-Injunction Act, Bob Jones Univ. v. Simon, 416 U.S. 725, 732 n.7 (1974), and to prevent taxpayers from "us[ing] the Declaratory Judgment Act to do what they were prohibited from doing under the Anti-Injunction Act," Eastern Kentucky Welfare Rights Org. v. Simon, 506 F.2d 1278, 1285 n.11 (D.C. Cir. 1974), vacated on other grounds, 426 U.S. 26 (1976); see also Alexander v. "Americans United" Inc., 416 U.S. 752, 759 n.10 (1974) (observing that the District of Columbia Circuit had held that the two provisions are coterminous, declining to pass judgment on that holding, but conceding that "the federal tax exception to the Declaratory Judgment Act is at least as broad as the prohibition of the Anti-Injunction Act"). The purposes of the two statutory provisions are to allow the Federal Government to assess and collect allegedly due taxes without judicial

_____

[13] The Tenth Circuit stated that finding the two provisions coextensive "is consistent with common sense, since an injunction of a tax and a judicial declaration that a tax is illegal have the same prohibitory effect on the federal government's ability to assess and collect taxes." Wyoming Trucking Ass'n, 82 F.3d at 933.

20

interference and to compel taxpayers to raise their objections to collected taxes in suits for refunds. <u>Enochs v. Williams Packing Co.</u>, 370 U.S. 1, 7 (1962) (concerning the Anti-Injunction Act); <u>Flora v. United States</u>, 362 U.S. 146, 164 & n.29 (1960) (concerning the Declaratory Judgment Act). In light of the two provisions' coextensive nature, a finding that one of the two statutes does not bar the debtors in the instant cases from seeking and obtaining free and clear orders will necessitate a finding that the other statute does not pose an obstacle either.

In <u>South Carolina v. Regan</u>, 465 U.S. 367 (1984), the Supreme Court was asked to determine whether the Anti-Injunction Act barred the State of South Carolina from seeking injunctive and other relief in a suit challenging the constitutionality of a provision of the Internal Revenue Code that imposed a tax on interest earned from bearer bonds. <u>Id</u>. at 370-71. The Court held that the Anti-Injunction Act "was not intended to bar an action where . . . Congress has not provided the plaintiff with an alternative legal way to challenge the validity of a tax." <u>Id</u>. at 373. The Court observed that the statute has no recorded legislative history, but found that "the circumstances of its enactment strongly" supported the Court's finding: the Court observed that an earlier version of the statute provided an alternative legal avenue for challenging taxes--namely, a suit for a refund. <u>Id</u>. at 373. The Court further noted that, in cases in which it had held that the Anti-Injunction Act barred a suit, the taxpayers could have paid the disputed sums and then sued for refunds, and that it had previously declared that one of the central purposes of the Act was "to require that the legal right to . . . disputed sums be determined in a suit for refund." <u>Id</u>. at 374-76 (quoting <u>Williams Packing Co.</u>, 370 U.S. at 7). The Court then held that, because the challenged tax would be imposed on bondholders, rather than on South Carolina, and because the State would have no direct means of challenging that tax, the Anti-Injunction Act did not bar the suit. <u>Id</u> . at 378-80.

In the cases at bar, we find that the debtors do not have any "alternative legal way" to challenge the imposition of Coal Act successor liability on the purchasers of their assets and that, consequently, neither the tax-exclusion provision of the Declaratory Judgment Act nor the Anti-Injunction Act barred the district courts from reaching the merits of the cases and ordering the appropriate relief. The debtors in

21

the cases before us are, in many respects, in the same position that the State of South Carolina occupied in Regan: they need to know, not whether they can themselves be held liable for particular taxes, but whether those taxes can be assessed against a third party. More specifically, the debtors need to know whether they can sell their assets free and clear of liability for their Coal Act premiums (while in no way thereby avoiding liability for those premiums themselves), so that, in the case of the Leckie Smokeless debtors, they can meet an absolute condition of purchase imposed by Royal Scot or, in the case of the Lady H debtors, they can gain the right to have escrowed funds added to the value of their bankruptcy estates. The debtors cannot themselves pay all Coal Tax premiums owed, whether already accrued or yet to be assessed, then challenge the imposition of joint and several liability on third parties, the purchasers of their assets. Nor does the Coal Act itself provide any means by which a coal operator can challenge the imposition of successor liability on a third party.

The Plan and Fund disagree, pointing out that the debtors have always had the right to challenge their monthly and annual Coal Act assessments, and that the purchasers of their assets can bring similar challenges if joint and several liability is imposed upon them for the debtors' Coal Act obligations. See, e.g., 26 U.S.C. § 9706(f) (stating that an operator may ask the Commissioner of Social Security to review the assignment of a beneficiary to it). The Plan and Fund have misapprehended the nature of the orders sought by the debtors. The debtors have not disputed their own Coal Act liabilities; instead, they require a determination of whether, in an attempt to generate funds with which to pay at least a portion of their obligations to the Plan, the Fund, and their other creditors, they can sell their assets free and clear of those liabilities.

We therefore find that the district courts had jurisdiction to reach the merits of the debtors' motions to sell their assets free and clear of their Coal Act obligations and had the authority to provide the necessary relief.

IV.

The Coal Act imposes liability for Plan premiums upon "last signatory operators" and their "related persons" and "successors in inter-

22

est." 26 U.S.C. §§ 9711(g)(1), 9712(d). The Act imposes liability for Fund premiums upon "assigned operators" and their "related persons" and "successors in interest." Id.§§ 9701(c)(2), 9704(a). The Act does not define the phrase "successor in interest."

The courts below determined that the purchasers of Appellees' assets would not be Appellees' successors in interest within the meaning of the Act.**14** We need not and do not now resolve the matter, having concluded that, even if Royal Scot would be, and Green Valley is, a successor in interest,**15** the Bankruptcy Court may extinguish Coal Act successor liability pursuant to 11 U.S.C.§ 363(f)(5).

_____

**14** They reached that conclusion by reasoning as follows. The Coal Act was enacted as an amendment to the Internal Revenue Code of 1986. See Pub. L. No. 102-486, 106 Stat. 2776, 3037. In the Code's implementing regulations, the term "successor in interest" is defined as "an acquiring corporation that succeeds to the tax attributes of an acquired corporation by means of a transaction subject to" another provision of the Code. 26 C.F.R. § 1.1503-2(c)(12). Purchasers of assets in bankruptcy do not always succeed to the tax attributes of the sellers. Consequently, the purchasers of Appellees' assets cannot be Appellees' successors in interest within the meaning of the Coal Act and so cannot be held liable for Appellees' Fund and Plan premiums.

Though we note that the Code's implementing regulations contain several definitions of the phrase "successor in interest," see, e.g., 26 C.F.R. § 1.367(e)-1(c)(3)(vi)(B) (providing the definition that is to be applied when dealing with nonrecognition of gains under particular circumstances); id. § 7.367(b)-(12)(b) (providing the definition that is to be applied when dealing with particular kinds of exchanges between foreign and domestic corporations); id. § 301.6110-2(l) (providing the definition that is to be applied when dealing with public inspection of written determinations issued by the Internal Revenue Service), and though we note that section 1.1503-2(c)(12), the regulation relied upon by the district courts, provides the definition that is to be applied "for purposes of th[at] section"--a section dealing with dual consolidated losses, a matter having no apparent relevance to the issues raised in the cases at bar--we need not and do not here decide whether the district courts applied the definition contemplated by Congress.

**15** Should the successorship issue arise in a future case brought before us, we may then have to determine whether the last two words in the phrase "successor in interest" are meaningless or redundant.

23

Section 363(f)(5) states that a trustee may sell property free and clear of another entity's interest in that property if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." In Lady H, the District Court, ruling in the alternative, adopted the Bankruptcy Court's proposed finding that the Plan could be required to accept such satisfaction of its interest. The Plan has not appealed that aspect of the District Court's reasoning, and we perceive no grounds for disturbing that ruling sua sponte.**16** Moreover, we find that the District Court's reasoning applies with equal force to the Fund's and Plan's objections to the Leckie Smokeless debtors' motion to sell, and so dispose of their appeal of the District Court's opinion in that case accordingly.

The Plan and Fund have raised several objections to the conclusion we have reached. First, they have argued that Coal Act premiums are taxes and that liability for future, unassessed taxes cannot be extinguished pursuant to a free and clear order. In support of that contention, the Plan and Fund have cited LTV Steel Co. , 53 F.3d at 496-98; Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147-48 (6th Cir. 1991), cert. dismissed, 503 U.S. 978 (1992); Holly's, Inc. v. City of Kentwood (In re Holly's, Inc.), 172 B.R. 545, 562 (Bankr. W.D. Mich. 1994); and In re Maley, 152 B.R. 789, 792 (Bankr. W.D.N.Y. 1992). While we agree that Coal Act premiums are taxes, we find no legal basis for Appellants' argument that, as a general matter, property cannot be sold to an unrelated third party free and clear of a debtor's future tax obligations. We have noted, in this regard, that the Code itself articulates no such restriction; that Congress has given no indication that bankruptcy courts cannot order property sold free and clear of interests that Congress has itself created by statute; and that none of the four cases cited by Appellants supports their contention.**17**

_____

**16** With respect to the task of determining the amount of such satisfaction, for example, we have noted that bankruptcy courts may "estimate[ ] . . . any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1).

**17** In LTV Steel Co., the Second Circuit was asked to resolve two statutory issues: whether a debtor could itself be relieved of its Coal Act obli-

24

Second, the Plan and Fund have argued that they possess neither "claims" nor "interests in property" within the meaning of the Bankruptcy Code. We have rejected those contentions, supra.

Third, the Plan and Fund have contended that, by allowing the Bankruptcy Court to order the sale of the debtors' assets free and clear of the debtors' Coal Act obligations, the District Court in Lady H has granted purchasers in bankruptcy settings a windfall: while such purchasers might have been liable for debtors' Coal Act obligations if the sales had not occurred in bankruptcy settings, they are permitted to escape those obligations if they insist that the debtors obtain free and clear orders.**18** We reject that argument, finding that it is our duty to enforce the statutory scheme that Congress has erected.

_____

gations due to the Fund's failure to file a timely proof of claim, where the debtor had filed for bankruptcy relief six years before the Coal Act was enacted, and whether Coal Act premiums are taxes and therefore entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(1)(B). See 53 F.3d at 496-98. The case in no way dealt with whether Coal Act successor liability may be extinguished pursuant to section 363(f).

In Wolverine Radio Co., the Sixth Circuit was asked to determine whether the Michigan Employment Security Commission could apply the debtor's tax rating to the debtor's successor despite the fact that a free and clear order had been entered. See 930 F.2d at 1134-35. The court held that it could, finding that the tax rating was not an "interest in property" within the meaning of section 363(f), id. at 1146-47; that none of the five conditions under which a free and clear order may be issued had been met with respect to the tax rating, id. at 1147 n.24; and that the successor's tax liability arose only as a result of its own post-petition employment of workers, id. at 1149. The instant cases are distinguishable on each of those three grounds.

The decisions in Holly's, Inc. and In re Maley are far afield from the issues raised in the cases at bar. In those cases, the bankruptcy courts merely held that they lacked subject matter jurisdiction to determine the debtors' post-petition tax liabilities. See Holly's, Inc., 172 B.R. at 562; In re Maley, 152 B.R. at 791-92. In the cases at bar, the debtors have not challenged their own Coal Act liabilities.

**18** That argument rests, of course, upon the assumption that an entity becomes a coal operator's successor in interest merely by purchasing its assets. Again, we here express no opinion concerning that matter.

25

Finally, the Plan and Fund have argued that, by allowing bankruptcy courts to declare that the purchasers of coal operators' assets take those assets free and clear of the operators' Coal Act obligations, the District Court in Lady H has set the stage for the same kind of funding crisis that prompted the enactment of the Coal Act. Though we are cognizant of the Plan's and Fund's concerns, we find their argument insufficiently persuasive to disturb the statutory scheme as we have found it. First, the Plan's and Fund's concerns are probably most appropriately addressed to Congress. Second, it might very well be that, at least in circumstances such as those presented in the cases at bar, a rule permitting the issuance of free and clear orders protects the Fund's and Plan's interests more effectively than a contrary rule. In Leckie Smokeless, for example, the Bankruptcy Court found that $1.9 million represented a fair and reasonable price for the debtors' assets; the debtors' accrued Coal Act obligations, though, stand at about $7 million. If a free and clear order could not be issued, the assets would almost inevitably have to be sold piecemeal, thereby generating fewer funds with which to satisfy the claims of the Fund, the Plan, and the debtors' other creditors.

We have reviewed Appellants' remaining arguments and find them to be equally without merit.

V.

For the foregoing reasons, we sustain the district courts' decisions to overrule the Plan's and Fund's objections to the sale of Appellees' assets free and clear of Appellees' Coal Act obligations.

AFFIRMED

26