**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ADVENTURE RESOURCES,
INCORPORATED, a West Virginia
corporation; AMIGO SMOKELESS COAL
COMPANY, a West Virginia
corporation; TOMMY CREEK COAL
COMPANY, a West Virginia
corporation; GREEN MOUNTAIN
ENERGY, INCORPORATED, a West
Virginia corporation; M.A.E.
SERVICES, INCORPORATED, a West
Virginia corporation; MABEN ENERGY
CORPORATION, a West Virginia
corporation; RALEIGH LEASING,
INCORPORATED, a West Virginia
corporation; STONEY COAL COMPANY,
a West Virginia corporation; SPRUCE
LAUREL COAL COMPANY, a West                    No. 96-1557
Virginia corporation; HAWLEY COAL
MINING CORPORATION, a West
Virginia corporation; BICKFORD
MINING, INCORPORATED, also known
as Allports Coals, Incorporated, a
West Virginia corporation; BARRETT
FUEL CORPORATION, successor by
merger to Beckley Lick Run
Company, a West Virginia
corporation; EAST GULF FUEL
CORPORATION, a West Virginia
corporation; COAL X EQUIPMENT &
SUPPLY COMPANY, INCORPORATED,
formerly known as Lakeside Supply
Company, Incorporated, a West
Virginia corporation; BECKLEY

REPAIR & HYDRAULIC SERVICE,
INCORPORATED, a West Virginia
corporation; HALFWAY,
INCORPORATED, a West Virginia
corporation; CHESAPEAKE LEASING,
INCORPORATED, a West Virginia
corporation; PINEY FUEL
CORPORATION, a West Virginia
corporation; LAKESIDE LEASING,
INCORPORATED, formerly known as
Airplane Leasing, Incorporated, a
West Virginia corporation; RALEIGH
SERVICES, INCORPORATED, a West
Virginia corporation; ATLAS COAL
LEASING, INCORPORATED, a West
Virginia corporation; SUGAR CAMP
MINING, INCORPORATED, a West
Virginia corporation; H. D.
ENTERPRISES, LIMITED, a West
Virginia corporation; JET COAL
SERVICES, INCORPORATED, a West
Virginia corporation; MICROBLACK,
INCORPORATED, a West Virginia
corporation; DOVER COAL SALES,
INCORPORATED, a West Virginia
corporation; NO. 10 MINING,
INCORPORATED, a West Virginia
corporation; PANTHER RED ASH LAND
COMPANY, INCORPORATED, a West
Virginia corporation,
Plaintiffs-Appellees,

v.

MICHAEL H. HOLLAND, MARTY D.
HUDSON, ELLIOT A. SEGAL, PAUL R.

DEAN, Trustees of the UMWA 1950
Pension Trusts and UMWA 1974
Pension Trusts; UNITED MINE
WORKERS OF AMERICA 1974 PENSION
TRUST; UNITED MINE WORKERS OF
AMERICA 1950 PENSION TRUST;
MICHAEL H. HOLLAND, MARTY D.
HUDSON, ELLIOT A. SEGAL, THOMAS
O. S. RAND, CARLTON R. SICKLES,
and GAIL R. WILENSKY, WILLIAM P.
HOBGOOD, Trustees of the United
Mine Workers of America
Combined Benefit Fund; UNITED
MINE WORKERS OF AMERICA
COMBINED FUND; MICHAEL H.
HOLLAND, MARTY D. HUDSON,
THOMAS F. CONNORS and ROBERT D.
WALLACE, Trustees of the UMWA
1992 Benefit Plan; UNITED MINE
WORKERS OF AMERICA 1992 BENEFIT
PLAN; MICHAEL H. HOLLAND, MARTY
D. HUDSON, THOMAS F. CONNORS,
ELLIOT A. SEGAL, Trustees of the
UMWA 1993 Benefit Plan; UNITED
MINE WORKERS OF AMERICA 1993
BENEFIT PLAN; and MICHAEL H.
HOLLAND, MARTY D. HUDSON, ELLIOT
A. SEGAL, JOSEPH J. STAHL, II,
Trustees of the UMWA Cash
Deferred Savings Plan of 1988;
UNITED MINE WORKERS  OF AMERICA
CASH DEFERRED SAVINGS PLAN OF
1988,
<u>Defendants-Appellants,</u>

and

3

DONNA E. SHALALA, Secretary,
Department of Health & Human
Services, Social Security
Administration of the United States
of America,
Defendant.

ADVENTURE RESOURCES,
INCORPORATED, a West Virginia
corporation,
Plaintiff-Appellant,

and

AMIGO SMOKELESS COAL COMPANY, a
West Virginia corporation; TOMMY
CREEK COAL COMPANY, a West
Virginia corporation; GREEN
MOUNTAIN ENERGY, INCORPORATED, a
West Virginia corporation; M.A.E.
SERVICES, INCORPORATED, a West

Virginia corporation; MABEN ENERGY
CORPORATION, a West Virginia
corporation; RALEIGH LEASING,
INCORPORATED, a West Virginia
corporation; STONEY COAL COMPANY,
a West Virginia corporation; SPRUCE
LAUREL COAL COMPANY, a West
Virginia corporation; HAWLEY COAL
MINING CORPORATION, a West
Virginia corporation; BICKFORD
MINING, INCORPORATED, also known
as Allports Coals, Incorporated, a
West Virginia corporation; BARRETT

No. 96-1938

FUEL CORPORATION, successor by merger to Beckley Lick Run Company, a West Virginia corporation; EAST GULF FUEL CORPORATION, a West Virginia corporation; COAL X EQUIPMENT & SUPPLY COMPANY, INCORPORATED, formerly known as Lakeside Supply Company, Incorporated, a West Virginia corporation; BECKLEY REPAIR & HYDRAULIC SERVICE, INCORPORATED, a West Virginia corporation; HALFWAY, INCORPORATED, a West Virginia corporation; CHESAPEAKE LEASING, INCORPORATED, a West Virginia corporation; PINEY FUEL CORPORATION, a West Virginia corporation; LAKESIDE LEASING, INCORPORATED, formerly known as Airplane Leasing, Incorporated, a West Virginia corporation; RALEIGH SERVICES, INCORPORATED, a West Virginia corporation; ATLAS COAL LEASING, INCORPORATED, a West Virginia corporation; SUGAR CAMP MINING, INCORPORATED, a West Virginia corporation; H. D. ENTERPRISES, LIMITED, a West Virginia corporation; JET COAL SERVICES, INCORPORATED, a West Virginia corporation; MICROBLACK,

5

INCORPORATED, a West Virginia corporation; DOVER COAL SALES, INCORPORATED, a West Virginia corporation; NO. 10 MINING, INCORPORATED, a West Virginia corporation; PANTHER RED ASH LAND COMPANY, INCORPORATED, a West Virginia corporation,

Plaintiffs,

v.

MICHAEL H. HOLLAND, MARTY D. HUDSON, ELLIOT A. SEGAL, PAUL R. DEAN, Trustees of the UMWA 1950 Pension Trusts and UMWA 1974 Pension Trusts; UNITED MINE WORKERS OF AMERICA 1974 PENSION TRUST; UNITED MINE WORKERS OF AMERICA 1950 PENSION TRUST; MICHAEL H. HOLLAND, MARTY D. HUDSON, ELLIOT A. SEGAL, THOMAS O. S. RAND, CARLTON R. SICKLES, and GAIL R. WILENSKY, WILLIAM P. HOBGOOD, Trustees of the United Mine Workers of America Combined Benefit Fund; UNITED MINE WORKERS OF AMERICA COMBINED FUND; MICHAEL H. HOLLAND, MARTY D. HUDSON, THOMAS F. CONNORS and ROBERT D. WALLACE, Trustees of the UMWA 1992 Benefit Plan; UNITED MINE WORKERS OF AMERICA 1992 BENEFIT PLAN; MICHAEL H. HOLLAND, MARTY D. HUDSON, THOMAS F. CONNORS,

6

ELLIOT A. SEGAL, Trustees of the
UMWA 1993 Benefit Plan; UNITED
MINE WORKERS OF AMERICA 1993
BENEFIT PLAN; and MICHAEL H.
HOLLAND, MARTY D. HUDSON, ELLIOT
A. SEGAL, JOSEPH J. STAHL, II,
Trustees of the UMWA Cash
Deferred Savings Plan of 1988;
UNITED MINE WORKERS OF AMERICA
CASH DEFERRED SAVINGS PLAN OF
1988,
<u>Defendants-Appellees,</u>

and

DONNA E. SHALALA, Secretary,
Department of Health & Human
Services, Social Security
Administration of the United States
of America,
<u>Defendant.</u>

Appeals from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, Chief District Judge.
(CA-94-858-2, BK-91-50509, AP-93-197)

Argued: August 13, 1997

Decided: February 27, 1998

Before RUSSELL,* Circuit Judge, HALL, Senior Circuit Judge,
and MICHAEL, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

*Judge Russell participated in the decision of this case, but died prior
to the time the opinion was issued. The opinion is filed by a quorum of
the panel pursuant to 28 U.S.C. § 46(d).

7

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Senior Judge Hall wrote the opinion, in which Judge Russell and Senior Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Jami Wintz McKeon, MORGAN, LEWIS & BOCKIUS, L.L.P., Philadelphia, Pennsylvania, for Appellants. John Allen Rollins, LEWIS, FRIEDBERG, GLASSER, CASEY & ROLLINS, Charleston, West Virginia, for Appellees. **ON BRIEF:** David W. Allen, Larry D. Newsome, Barbara Locklin-George, Brian H. Benjet, Office of the General Counsel, UMWA HEALTH & RETIREMENT FUNDS, Washington, D.C.; Marilyn L. Baker, MOONEY, GREEN, BAKER, GIBSON & SAINDON, P.C., Washington, D.C., for Appellants.

_____

**OPINION**

HALL, Senior Circuit Judge:

The primary question before us in this appeal is whether a debtor in bankruptcy operating under the aegis of Chapter 11 may, with regard to an executory contract in effect at the time of the filing of the petition for reorganization, continue to reap the benefits of its bargain without concern that the non-debtor party will be made whole for the debtor's unfulfilled prepetition obligations. We hold, in accordance with the pronouncement of the Supreme Court in NLRB v. Bildisco & Bildisco, that it may not.

I.

A.

The Adventure Group comprises forty-six companies, all of which are affiliates or subsidiaries of Adventure Resources, Inc. The Adventure companies are involved, to varying degrees, in nearly every aspect of the production of coal. For instance, certain of the compa-

8

nies merely own or lease the mine properties and the coal beneath them. Other Adventure companies actually mine and prepare the coal, and still others provide support services such as supplies and equipment.

In December 1992, twenty of the Adventure companies filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. Among the myriad of Adventure's creditors were six trusts established to provide pension, health, disability, and death benefits to members of the United Mine Workers of America and their dependents. Together, these trusts constitute the UMWA Health and Retirement Funds ("the Funds").

Four of the trusts (the 1950 Pension Trust, the 1974 Pension Trust, the Cash Deferred Savings Plan of 1988, and the 1993 Benefit Plan) were created as the result of NBCWAs -- collective bargaining agreements negotiated by the UMWA with the Bituminous Coal Operators Association.**1** The remaining two trusts (the Combined Benefit Fund and the 1992 Benefit Plan) exist by operation of law; they were established as a result of the enactment of the Coal Industry Retiree Health Benefit Act, 26 U.S.C. §§ 9701-9722 (the "Coal Act").

Adventure was among the coal operator signatories to the NBCWA of 1988, the collective bargaining agreement in effect at the time of the bankruptcy filing. Pursuant to the 1988 agreement, the employers undertook to ensure the funding of employee pension and health benefits initially payable during the contract term. In addition, the employers guaranteed the funding of benefits already being administered by the 1950 and 1974 Pension Trusts; those trusts were "incorporated by reference and made a part of this Agreement." NATIONAL BITUMINOUS COAL WAGE AGREEMENT OF 1988 art. XX,§§ (b), (c)(1).

Adventure did not live up to its part of the bargain. Instead, as evidenced by the preliminary report of an independent business analysis prepared in 1988, Adventure engaged in a deliberate strategy of expanding its mining operations at the expense of its employees:

_____

**1** NBCWA is an abbreviation for "National Bituminous Coal Wage Agreement."

9

> In 1985 and a portion of 1986, the companies began exten-
> sive mine development. . . . [M]ine development and sus-
> taining capital costs are not easily financed, and
> management was faced with significant cash obligations.
> Management felt that expanding vendor credit beyond the
> level being used at the time was impossible and sought other
> sources of funds. The decision was made to not make pay-
> ments, as due, to the mineworkers pension and benefit
> funds. . . . This "funding" mechanism was viewed as short-
> term but necessary, and the deferral of these payments was
> undertaken.

May 5, 1988, Preliminary Report of David A. Harrah, CPA, to John P. Lamond, Treasurer, Westmoreland Coal Co.

Adventure's "deferral" of its pension and health benefit contributions was anything but short-term. Once it had initially defaulted on its payments to the Funds, Adventure continued to remain in arrears. Even after filing for reorganization, Adventure satisfied neither its ongoing obligations to the 1950 and 1974 Pension Trusts, nor those subsequently imposed by the Coal Act and the 1993 NBCWA.[2] As a result of Adventure's business "`funding' mechanism," the Funds' claims may exceed $25 million, including approximately $4-5 million assessed during the 43-month duration of the Chapter 11 bankruptcy.[3]

B.

The twenty Adventure companies in Chapter 11, joined by eight non-debtor affiliates, filed this adversary proceeding in the bankruptcy court to determine the viability and priority of the claims filed by three of the trusts. See 28 U.S.C. § 157(b)(1) (conferring jurisdic-

_____

[2] To comply with the Coal Act, Adventure was required to make payments to the Combined Benefit Fund and to the 1992 Benefit Plan (the "Coal Act trusts"). Consistent with the terms of the 1993 NBCWA, Adventure agreed to contribute to the Cash Deferred Savings Plan of 1988 and to the 1993 Benefit Plan.

[3] On July 25, 1996, after the notice of appeal was filed in the instant matter, the bankruptcy court, upon Adventure's motion, converted the case to a liquidation proceeding under Chapter 7.

tion upon the bankruptcy judges over certain "core" bankruptcy proceedings, as outlined in § 157(b)(2)). By order dated June 23, 1994, the district court, pursuant to its authority under 28 U.S.C. § 157(d), withdrew its reference of the proceeding to the bankruptcy court. The remaining three trusts were subsequently granted leave to intervene as additional defendants and to file a counter-complaint against Adventure.

Following a period of discovery, the Funds moved for partial summary judgment, contending that virtually all of their claims were entitled to be designated administrative expenses of the bankruptcy estate. See 11 U.S.C. § 507(a)(1) (according first priority to "administrative expenses allowed under section 503(b) of this title").**4** The district court, by memorandum opinion and order dated March 8, 1996, granted the motion as to the claims filed by the Coal Act trusts. See note 2, supra. However, with respect to the vast bulk of the Funds' claims, i.e., the pre-bankruptcy amounts owed by Adventure to the 1950 and 1974 Pension Trusts, the court below denied the motion. Adventure Resources, Inc. v. Holland, 193 B.R. 787 (S.D. W. Va. 1996).**5**

The district court concluded that the Funds' claims pursuant to the Coal Act did not accrue until after the filing of the Chapter 11 petitions in late 1992. The initial contributions and benefit premiums exacted by the terms of the Coal Act are, the district court ruled, taxes on the bankruptcy estates, and are therefore administrative expenses within the contemplation of 11 U.S.C. § 503(b)(1)(B)(i). 193 B.R. at 793-96.

_____

**4** Adventure's creditors have filed over $160 million in claims relating to its pre-bankruptcy operations. During the oral argument of this matter, counsel for the Chapter 7 trustee surmised that the sale of the estate's assets will generate only enough cash to pay the secured claims, the costs of the liquidation, and an unspecified portion of the expenses associated with the administration of the Chapter 11 bankruptcy.

**5** The parties do not appear to dispute that the claims filed by the 1993 Benefit Plan and the Cash Deferred Savings Plan of 1988, to the extent that they are attributable to obligations assumed by Adventure pursuant to its 1993 wage agreement, see note 2, supra, are entitled to priority as postpetition administrative expenses of the bankruptcy estates.

Regarding Adventure's obligations to the 1950 and 1974 Pension Trusts, the district court dismissed the Funds' arguments that 11 U.S.C. §§ 1113(f) and 1114(e) (addressing, respectively, the rejection in bankruptcy of collective bargaining agreements and the payment of certain health insurance benefits to retired employees of Chapter 11 debtors) conferred first priority status upon the entirety of those claims, regardless of whether they accrued prior to the filing of the petitions. The district court determined instead that any claims for benefit contributions payable pursuant to an NBCWA were entitled to administrative expense priority only insofar as they had initially arisen postpetition. 193 B.R. at 796-98.

The Funds appeal that portion of the district court's order denying them summary judgment as to the claims of the Pension Trusts originating prior to Adventure's immersion in bankruptcy. The Chapter 7 trustee cross-appeals the remainder of the order granting summary judgment to the Funds on the Coal Act claims; the notice of cross-appeal incorporates the district court's order of June 26, 1996, denying Adventure's post-proceeding motions for relief under Fed. R. Civ. P. 59(e) and 60(b).

We agree with the district court that the Funds' claims under the Coal Act did not arise until after Adventure had already filed its petitions for reorganization. Inasmuch as these claims are for unpaid taxes, they must be accorded administrative expense priority. Consequently, we affirm the district court's grant of summary judgment to the Funds as to the Coal Act claims.

The district court also correctly determined that the plain language of 11 U.S.C. §§ 1113(f) and 1114(e) does not accommodate the notion that Congress specifically intended to address through those statutes the priority of claims for unpaid pension benefit obligations. In the absence of specific direction from the legislative branch, we conclude that, where such claims emanate from the breach of a collective bargaining agreement, they are to be granted priority in accordance with the law governing the treatment in bankruptcy of executory contracts in general.

Thus, where the Chapter 11 debtor has assumed the benefits and obligations of an existing collective bargaining agreement, but does

12

not comply with its statutory duty to cure all defaults then extant, any claims arising from the debtor's failure to cure are entitled to first priority as administrative expenses of the bankruptcy estate. Because the district court held to the contrary, i.e., that the Funds' claims are not entitled to any priority to the extent that they are attributable to prepetition defaults, we reverse its grant of summary judgment to Adventure as to the applicable Pension Trust claims. We will explain the reasons for our holdings in more detail below.

II.

The parties agree that no genuine issue of material fact exists at this stage of the litigation. Our task is simply to determine, on the undisputed facts, which party is entitled to judgment as a matter of law concerning the issues on appeal. FED. R. CIV. P. 56(c). In that respect, our review of the district court's application of the law is, as always, de novo. Patten v. United States, 116 F.3d 1029, 1031 (4th Cir. 1997).

III.

A.

Congress passed the Coal Act to redress the "looming insolvency" of the trusts that had been established by prior NBCWAs to provide health care benefits to retired coal miners. LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 484-85 (2d Cir. 1995). To that end, the Act created the Combined Benefit Fund to secure the continuation of health benefits for those retired miners who had been receiving them under the old system as of July 20, 1992. 26 U.S.C. § 9703(f). The Act also devised the 1992 Benefit Plan, which covered two other groups of miners: (1) those eligible for benefits as of February 1, 1993, and who retired by September 30, 1994; and (2) those "orphaned" upon the insolvency of an individual employer benefit plan. § 9712(b).

With regard to both new trusts, the Coal Act assessed initial, "prefunding" contributions against the coal operators who had signed the 1988 NBCWA. See §§ 9704(i) (Combined Fund), 9712(d)(1)(A) (1992 Plan). The Act also specified that, beginning on February 1,

13

1993, the affected operators would pay health benefit premiums to the trusts, based on the number of beneficiaries assigned to them by the Social Security Administration. See #8E8E # 9704(b) (Combined Fund), 9712(d)(1)(B) (1992 Plan). Lastly, the Act required the operators to pay additional premiums to the Combined Fund to provide death benefits for their employees and to ensure health coverage for the industry's unassigned beneficiaries. § 9704(c), (d).

B.

Section 503 of the Bankruptcy Code provides for the payment of expenses incurred in administering the bankruptcy estate. Allowable administrative expenses commonly include the direct costs of preserving the estate (for example, postpetition wages earned by the debtor's employees) and compensation for services rendered to the estate by professionals, such as attorneys and accountants. See 11 U.S.C. § 503(b)(1)(A), (4). We are more concerned at present, however, with that category of administrative expenses comprising"any tax . . . incurred by the estate[.]" § 503(b)(1)(B)(i).[6] Claims for taxes, like those for wages, professional fees, and other administrative expenses, are entitled to priority over all other unsecured claims. § 507(a)(1).

1.

The trustee contends that the assessments mandated by the Coal Act are not "taxes." The pertinent case authority is to the contrary. See In re Leckie Smokeless Coal Co., 99 F.3d 573, 583 (4th Cir. 1996) (Coal Act premiums are taxes whose validity may be determined in the federal courts notwithstanding the asserted jurisdictional bars of the Anti-Injunction Act and the Declaratory Judgment Act), cert. denied, 117 S. Ct. 1251 (1997).

_____

[6] Section 503(b)(1)(B)(i) excepts from its reach "a tax of a kind specified in section 507(a)(8) of this title." The latter provision, in turn, addresses the priority accorded claims of "governmental units" for, inter alia, certain income, property, employment, and excise taxes. Regardless of how one might characterize the Funds' Coal Act claims within the broader rubric of "taxes," the Funds themselves are not governmental units, and, therefore, their claims are not within the ambit of § 507(a)(8). Adventure Resources, 193 B.R. at 795 n.15. This aspect of the district court's ruling has not been challenged on appeal.

14

In Leckie, we recognized that Coal Act obligations "are involuntary pecuniary burdens imposed by Congress for the public purpose of restoring financial stability to coal miners' benefit plans,[7] and those burdens have been imposed as an exercise of Congress's taxing power." Id., citing Chateaugay at 498.[8] There is no doubt, then, that the assessments meet this circuit's definition of a "tax."[9]

2.

Remaining is the question of whether the taxes levied by the Coal Act were, in the case of the Adventure companies, "incurred by the estate[s]." The trustee argues in the negative, pointing out that the Coal Act was signed into law on October 24, 1992, antedating the filing of the bankruptcy petitions by more than a month. Under the terms of the statute, however, no claim could accrue to the Combined Fund and the 1992 Plan until February 1, 1993, well after the bankruptcy estates had been created.[10]

_____

**7 Cf. New Neighborhoods, Inc. v. W. Va. Workers' Comp. Fund**, 886 F.2d 714, 718 (4th Cir. 1989) ("The `public' purpose of systems such as the [workers' compensation scheme] in force and effect in West Virginia is to allocate the burden of the costs of injured employees and/or their dependents among employers rather than among the general public.").

**8** The court in Chateaugay was faced with the precise issue before us. The Second Circuit concluded that Coal Act assessments are taxes within the meaning of § 503(b)(1)(B)(i), entitled to administrative expense priority under § 507(a)(1).

**9 See United States v. City of Huntington, W. Va.**, 999 F.2d 71, 73 n.4 (4th Cir. 1993):

> For the purpose of determining claim priority in the context of bankruptcy, the courts have established the following elements of a tax: "(a) An involuntary pecuniary burden, regardless of name, laid upon individuals or property; (b) Imposed by, or under authority of the legislature; (c) for public purposes, including the purpose of defraying expenses of government of undertakings authorized by it; and (d) Under the police or taxing power of the state."

(quoting In re Lorber Industries, 675 F.2d 1062, 1066 (9th Cir. 1982)).

**10 See** 26 U.S.C.A. § 9702(c) ("The first plan year of the Combined Fund shall begin February 1, 1993. . . .") and 26 U.S.C.A. § 9712(b)(2)

15

A "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C.A. § 101(5)(A) (West 1993). Claims, however, do not exist in a vacuum; they must be possessed by creditors. See § 101(10) ("creditor" defined as, inter alia, an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor").

Neither the Combined Fund nor the 1992 Plan were capable of being anyone's creditor until at least February 1, 1993, the earliest date on which the trusts could have been entitled to collect their first premiums. See note 10, supra; 26 U.S.C.A. § 9704(a) (West Supp. 1997) ("Each assigned operator shall pay to the Combined Fund for each plan year beginning on or after February 1, 1993, an annual premium[.]"). Consequently, the entirety of the Coal Act claims filed against Adventure by these two trusts must necessarily have arisen postpetition.**11** We therefore affirm the district court's determination

_____

("[T]he term `eligible beneficiary' means an individual who . . . but for the enactment of this chapter, would be eligible to receive benefits from the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan, based upon age and service earned as of February 1, 1993[.]") (West Supp. 1997); In re CF & I Fabricators of Utah, Inc. , 169 B.R. 984, 987 (D. Utah 1994) ("[S]ection 9702 of the Coal Act establishes the Combined Fund and merges the UMWA 1950 and 1974 Benefit Plans into the Combined Fund effective February 1, 1993. . . .[S]ection 9712 of the Coal Act establishes the 1992 Benefit Plan, which also became effective on February 1, 1993.").

**11** We speculated in Leckie that a debtor's liability for future Coal Act premiums may attach prior to the filing of the bankruptcy petition, inviting the conclusion that a trust's entitlement to such premiums constitutes a prepetition claim. 99 F.3d at 580-81 & n.9; In re Westmoreland Coal Co., 213 B.R. 1, 12 (Bankr. D. Colo. 1997) ("[T]he Fourth Circuit [in Leckie] concluded that Coal Act obligations fell within the bankruptcy definition of a claim and characterized future premium obligations under § 9712 as unmatured and contingent rights[.]"). In Leckie, however, none of the eight debtors filed for bankruptcy prior to February 1, 1993, the date that the trusts' creditor status was effectively established. See 99 F.3d at 577 n.3, 578 n.6 (first petition filed on April 16, 1993).

that those claims be accorded administrative expense priority as taxes incurred by the estates.[12]

IV.

The final matter on appeal involves the Pension Trust claims, the lion's share of which the district court deemed ineligible for priority status as having initially accrued prior to the filing of the bankruptcy petitions. The Funds assert that the district court's ruling was in error, relying primarily on 11 U.S.C. §§ 1113 and 1114, enacted by Congress during the 1980s in response to a perceived threat to labor stability and to retiree health benefits posed by the bankruptcy reorganization of numerous large employers.

A.

Section 1114 simply has no application to the claims of the Pension Trusts. Although it commands that the trustee or debtor-in-possession pay "any" retiree benefits as an administrative expense of the bankruptcy estate, see § 1114(e) and note 12 supra, the term "retiree benefits" is limited to

_____

[12] The Funds have argued alternatively that the Coal Act claims should be accorded first priority status by virtue of 11 U.S.C. § 1114(e), which provides, in pertinent part:

> (1) Notwithstanding any other provision of this title, the debtor in possession, or the trustee . . . shall timely pay and shall not modify any retiree benefits, except[by court order after notice and a hearing, or as the parties may agree]. . . .

> (2) Any payment for retiree benefits required to be made before a plan confirmed under section 1129 of this title is effective has the status of an allowed administrative expense as provided in section 503 of this title.

(emphases supplied). The trustee contends (and the district court held) that § 1114(e) applies only to benefit payments due after the filing of the bankruptcy petition. The Funds respond forcefully that the word "any" in paragraphs (1) and (2) encompasses both pre- and postpetition payments. Inasmuch as we have already decided that all of the Coal Act claims arose postpetition, we leave for another day the task of ascertaining the scope of § 1114(e).

17

> payments to any entity or person for the purpose of providing or reimbursing payments for retired employees and their spouses and dependents, <u>for medical, surgical, or hospital care benefits, or benefits in the event of sickness, accident, disability, or death</u> under any plan, fund, or program . . . maintained or established in whole or in part by the debtor prior to filing a petition commencing a case under this title.

11 U.S.C.A. § 1114(a) (West 1993) (emphasis supplied). True to their designations, the Pension Trusts administer only <u>pension</u> benefits for retired coal miners. None of their claims are for the types of benefits enumerated in § 1114(a).

B.

1.

Section 1113, by contrast, affects the treatment of pension benefits in bankruptcy to the extent that those benefits exist pursuant to a collective bargaining agreement. The statute provides that a Chapter 11 debtor (or trustee) may reject a collective bargaining agreement "only in accordance with the provisions of this section." 11 U.S.C.A. § 1113(a) (West 1993).**13** The whole of the agreement is protected, as are its components: "No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." § 1113(f).

_____

**13** If the debtor believes that its obligations under a collective bargaining agreement would inhibit its effective reorganization, it must first make a good-faith effort to negotiate a modification of the contract with its employees' authorized representative. § 1113(b). In the event of an impasse, the bankruptcy court may, after notice and a hearing, permit the debtor to reject the collective bargaining agreement only if (1) the debtor's proposed modifications are "necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably"; (2) the employees' authorized representative has, without good cause, refused to accept the debtor's proposal; and (3) the balance of the equities clearly favors rejection of the collective bargaining agreement.§ 1113(c).

The parties acknowledge that, during the course of its attempted reorganization, Adventure never sought to reject or modify its labor agreement with the UMWA in accordance with § 1113; it merely continued to breach its contractual obligation to pay the premiums due the Pension Trusts. The Funds maintain that Adventure's breach, in essence, unilaterally altered the pension contribution provision of the 1988 NBCWA, in contravention of § 1113(f). According to the Funds, the only means of giving full force and effect to the statute is to compensate the Pension Trusts for the breach by granting all of their claims for unpaid premiums priority in distribution from the bankruptcy estates.

The Funds' position finds some support in the holding of In re Unimet Corp., 842 F.2d 879, 884 (6th Cir. 1988). In that case, the court of appeals opined that § 1113(f)'s "unequivocal" prohibition against the modification of collective bargaining agreements means that a debtor in Chapter 11 "cannot escape its obligations in [that] regard." Id. Unimet was therefore ordered to continue paying health and life insurance premiums on behalf of its retirees, pursuant to its prepetition agreement with the steelworkers' union.

We agree that the language employed by Congress in§ 1113 is unequivocal, insofar as it goes. It plainly imposes a legal duty on the debtor to honor the terms of a collective bargaining agreement, at least until that agreement is properly rejected. By implication, the statute creates a claim on behalf of the debtor's employees in the event that the debtor fails to comply with the law.

Section 1113, however, offers no advice as to how this new category of claims should be treated vis a vis other categories competing for payment. The statute's silence stands in stark contrast to § 1114, see Section IV-A supra, which clearly states that "[a]ny payment for retiree benefits required to be made before a plan confirmed under section 1129 of this title is effective has the status of an allowed administrative expense[.]" 11 U.S.C.A. § 1114(e)(2) (West 1993).

The Unimet court explicitly declined to decide whether benefit premiums payable under § 1113 are administrative expenses, deeming resolution of the issue immaterial to its conclusion that the premiums had to be paid. 842 F.2d at 884. To the extent that the Sixth Circuit's

19

rationale has been followed by the lower courts, a so-called "superpriority" has attached to claims within the purview of § 1113. E.g., Eagle, Inc. v. Local No. 537 of United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Indus. of United States and Canada, AFL-CIO, 198 B.R. 637, 638-39 (D. Mass. 1996).

The obvious difficulty with the approach taken in Unimet and its progeny is that it engenders disharmony between § 1113 and the carefully ordered hierarchy of priorities embodied in § 507. "Section 507 is intended to be the exclusive list of priorities in bankruptcy. Priorities are to be fixed by Congress. Courts are not free to fashion their own rules of superpriorities or subpriorities within any given priority class." 3 LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY ¶ 507.02[2] (15th ed. 1996), cited in In re Ionosphere Clubs, Inc., 22 F.3d 403, 408 (2d Cir. 1994) (Ionosphere II).

The Second and Third Circuits have both observed that, on those infrequent occasions where Congress has intended to supersede the general priority scheme set forth in § 507, it has done so explicitly. See Ionosphere II at 408 (citing § 1114(e)(2)'s allowance of claims for retiree benefits as administrative expenses); In re Roth American, Inc., 975 F.2d 949, 956 (3d Cir. 1992) (citing § 364(c)(1)'s authorization for the bankruptcy court to accord "priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title" to credit obtained or debt incurred for the purpose of operating the debtor's business). As we have noted, explicit instruction from Congress concerning the priority of claims under § 1113 is conspicuously absent from the statute. "[T]here is no indication either from the language or the legislative history of section 1113 that Congress intended to address the priority to be given claims based on a collective bargaining agreement." Roth American at 956.

We believe that, to the extent possible, Sections 507 and 1113 must be construed harmoniously. It is imperative to the orderly administration of the bankruptcy process that § 507 remains, unless otherwise clearly specified by Congress, the final word on the priorities of competing claims. We can faithfully adhere to that principle in this case without doing violence to the legislative purpose inherent in § 1113:

> Section 507 only establishes the priority of [§ 1113] claims[;] it does not affect the underlying obligation . . . .

20

Judicial ordering of benefit claims pursuant to§ 507 is not equivalent to employer avoidance of obligations under a collective bargaining agreement. The collective bargaining agreement is respected, but the financial obligations issuing from it are accorded priority consistent with the Bankruptcy Code.

Ionosphere II at 407 (citation and quotation marks omitted); see Roth American at 957 ("The congressional goal embodied in section 1113 to give special consideration to a collective bargaining agreement and encourage the debtor and the union to reach a mutually acceptable agreement . . . can be satisfied without interfering with the previously established statutory priorities.").

2.

We conclude that a bankruptcy claim arising from the breach of a collective bargaining agreement may be accorded priority status only insofar as it fits into one of the categories singled out for preferential treatment in § 507. Fortunately for the Funds, the claims of the Pension Trusts are the proverbial round peg.

i.

We begin with the unremarkable premise that unexpired collective bargaining agreements are executory contracts. NLRB v. Bildisco & Bildisco, 465 U.S. 513, 521-22 (1984).**14** Their treatment in bankruptcy is, therefore, governed generally by 11 U.S.C. § 365, pertaining to executory contracts and unexpired leases entered into by the debtor prior to the filing of the bankruptcy petition. Id. at 522-23.

_____

**14** Upon examining the legislative history of the relevant portion of the Bankruptcy Code, the Supreme Court ascertained that Congress intended the term "executory contract" to describe those contracts "on which performance is due to some extent on both sides." Bildisco at 522 n.6 (quoting H.R.Rep. No. 95-595, at 347 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6303). Collective bargaining agreements typically impose reciprocal obligations on the employer and the union, on which performance is due at all times for the duration of the contract.

In Bildisco, the Supreme Court held that a debtor attempting a Chapter 11 reorganization may reject a collective bargaining agreement that "burdens the estate," provided that"after careful scrutiny" the equities balance in favor of rejection. Id. at 525-26; see 11 U.S.C. § 365(a) (stating that the trustee "may assume or reject any executory contract or unexpired lease of the debtor"). It was precisely this holding that inspired Congress's almost immediate enactment of § 1113 "to preclude employers from using bankruptcy law as an offensive weapon in labor relations by going into bankruptcy and unilaterally rejecting or modifying the extant collective bargaining agreement (or exerting leverage at the bargaining table by threatening to do so)." Roth American at 956 (citation omitted).

However, in erecting § 1113's substantive and procedural obstacles to the unilateral rejection of collective bargaining agreements, Congress did not indicate that it intended to otherwise restrict the general application of § 365 to those agreements. Section 1113 "governs only the conditions under which a debtor may modify or reject a collective bargaining agreement[.]" Id. (quoting In re Ohio Corrugating Co., 115 B.R. 572, 578 (Bankr. N.D. Ohio 1990), rev'd ,[15] United Steelworkers of America, AFL-CIO v. Ohio Corrugating Co. , No. 4:90CV0810, 1991 WL 213850 (N.D. Ohio Jan. 3, 1991)).

Thus, § 365 continues to apply to collective bargaining agreements, except where such an application would create an irreconcilable conflict with § 1113. Mass. Air Conditioning & Heating Corp. v. McCoy, 196 B.R. 659, 663 (D. Mass. 1996) ("Section 1113 is designed to provide additional procedural requirements for rejection or modification of collective bargaining agreements, and only to that degree supersedes and supplements the provisions in § 365.") (citing Norfolk and Western Ry. Co. v. American Train Dispatchers Ass'n , 499 U.S. 117, 136 n.2 (1991) (Stevens, J., dissenting)). The essential character of collective bargaining agreements as executory contracts, made plain in Bildisco, was left undisturbed by Congress.

_____

**15** The bankruptcy court's denial of priority status to the union's claims for wages and benefits in Ohio Corrugating was summarily reversed by the district court as inconsistent with the Sixth Circuit's interpretation of § 1113 in Unimet.

22

ii.

The collective bargaining agreement between the UMWA and Adventure was assumed in bankruptcy as the result of the latter's failure to reject it in accordance with § 1113. Roth American at 957. Where the debtor-in-possession assumes an executory contract, "it assumes the contract cum onere[.]"Bildisco at 531 (citation omitted).**16** That the obligations of an executory contract be accepted along with its benefits is made plain by the Bankruptcy Code's requirement that, as conditions of the contract's assumption, the debtor cure any existing default and compensate all non-debtor parties for actual pecuniary losses that have resulted therefrom. See§ 365(b)(1).

Upon assumption of the contract, "the expenses and liabilities incurred may be treated as administrative expenses, which are afforded the highest priority on the debtor's estate." Bildisco at 532; In re Stewart Foods, Inc., 64 F.3d 141, 145 (4th Cir. 1995).**17** There can be no doubt, of course, that the statutory duty to cure any existing default is a "liability" incurred by the debtor by virtue of its assumption in bankruptcy of an executory contract.

Hence, when Adventure assumed the collective bargaining agreement, it undertook a legal obligation to cure its existing defaults under that agreement, including the arrears to the Pension Trusts. Adventure's failure to comply with its legal obligation gave rise, under Bildisco and Stewart Foods, to an administrative expense claim on behalf of the Pension Trusts for the entirety of the arrearage. In effect, Adventure's postpetition assumption of its executory labor contract with the UMWA transformed the prepetition claims of the Pension

_____

**16** "What is taken cum onere  is taken subject to an existing burden or charge." BLACK'S LAW DICTIONARY 342 (5th ed. 1979).
**17** If the contract is instead rejected, the resulting damages (including any prepetition breach) constitute general, unsecured claims against the estate. Bildisco at 531; see Stewart Foods at 144-45 ("[R]egardless of the nature of the contract, if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a pre-petition claim in the bankruptcy proceedings.").

23

Trusts, once not cured, into new claims arising postpetition. In re Mushroom Transp. Co., Inc., 78 B.R. 754, 759 (Bankr. E.D. Pa. 1987).**18**

We conclude that the district court erred as a matter of law by declining to accord administrative expense priority to the Pension Trust claims insofar as the arrearage they represent initially accrued prior to the filing of the bankruptcy petitions. We therefore reverse its grant of summary judgment to Adventure as to those claims.

V.

We affirm the district court's orders of March 8, 1996, and June 26, 1996, granting summary judgment to the Funds regarding the priority classification of the Coal Act claims. We reverse the district court's order of March 8, 1996, to the extent that it granted summary judgment to Adventure regarding the priority classification of the Pension Trust claims. We remand the matter to the district court with

_____

**18** We tread no new ground in holding that prepetition defaults of executory contracts and leases assumed in bankruptcy, left uncured, constitute postpetition administrative expenses of the estate. A number of learned colleagues and commentators have blazed that trail before us. See, e.g., LJC Corp. v. Boyle, 768 F.2d 1489, 1494 n.6 (D.C. Cir. 1985); Mass. Air Conditioning & Heating 196 B.R. at 663; In re Moline Corp., 144 B.R. 75, 79 (Bankr. N.D. Ill. 1992); In re French, 131 B.R. 138, 141 (Bankr. E.D. Mo. 1991); In re Leon's Casuals Co., Inc., 122 B.R. 768, 771 (Bankr. S.D. Ala. 1990); In re Monroe Well Serv., Inc., 83 B.R. 317, 321 (Bankr. E.D. Pa. 1988); Mushroom, 78 B.R. at 759; 2 LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY ¶ 365.08[1] (15th ed. 1996) ("[A] trustee must proceed cautiously in electing whether to assume or reject [an executory contract] since an assumption will have the effect of making the expenses and liabilities incurred expenses of administration."); Jesse M. Fried, Executory Contracts and Performance Decisions in Bankruptcy, 46 DUKE L.J. 517, 525 (1996):

> If the trustee "assumes" the [executory] contract, Section 365 binds the bankruptcy estate to the contract, permitting the estate to seek performance from the other party under the contract's original terms. [O]bligations in connection with assumed contracts . . . are treated as postpetition administration claims. . . . Thus, the effect of assumption is that the estate acquires all of the debtor's rights and obligations under the contract.

24

instructions to enter summary judgment for the Funds as to the Pension Trust claims, according them administrative expense priority.

AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED WITH INSTRUCTIONS

25