**In re GENUITY INC., et al., Debtor.**

**No.  02B43558(PCB).**

United States Bankruptcy Court,
S.D. New York.

March 17, 2005.

Ropes & Gray, By William F. McCarthy, Esq., D. Ross Martin, Esq., Don S. DeAmicus, Esq., Boston, MA, for Debtors.

Kilpatrick Stockton LLP, By Todd C. Meyers, Esq., Michael D. Langford, Esq., Atlanta, GA, for BellSouth Telecommunications, Inc.

Potter Anderson & Corroon LLP, By Laurie Selber Silverstein, Esq., Wilmington, DE, for The SBC Affiliates.

### MEMORANDUM DECISION DENYING DEBTORS' REQUEST TO SETOFF PRE–PETITION SECURITY DEPOSITS AGAINST POST–PETITION CURE PAYMENTS

PRUDENCE CARTER BEATTY, Bankruptcy Judge.

The debtors, world leading telecommunications carriers, seek this court's approval to offset pre-petition security deposits against post-petition cure obligations. For the reasons set forth below, the court denies the debtors' motion.

### BACKGROUND

On November 27, 2002 (the "Filing Date") Genuity, Inc. and its fourteen domestic subsidiaries (collectively, "the Debtors") commenced Chapter 11 cases under the Bankruptcy Code (the "Code") for the purpose of liquidating their assets. Prior

to the Filing Date, the Debtors, together with their non-Debtor affiliates and subsidiaries, were among the world leading providers of internet services to business enterprises and telecommunications service providers.[1] More specifically, the Debtors' communication infrastructure included (1) a global fiber optic network consisting of broadband fiber optic cable in the United States, (2) point of presence locations where the Debtors provided internet access to end users, (3) secure back up fiber optic connections and power sources in the United States and Europe and (4) undersea and international fiber optic cable compatibility.

Prior to the Filing Date, the Debtors entered into numerous agreements for the provision of various telecommunication services and circuitry with BellSouth Telecommunications, Inc. ("BellSouth") and The SBC Affiliates [2] (together, the "Carriers").[3] As part of their due diligence, prior to entering into these agreements, the Carriers reviewed the Debtors' accounts, financial information and other relevant credit information. Based upon their investigations, and in accordance with applicable federal tariffs, the Carriers requested, and the Debtors agreed, to provide a security deposit as a "guarantee of the payment of rates and charges."[4] The Debtors tendered a security deposit to BellSouth in the approximate amount of $1 million and to The SBC Affiliates in the

1. This status is commonly referred to as a Tier 1 internet backbone provider. Tier 1 internet backbone providers have the network, scale and on-network traffic to offer their customers connectivity to virtually all addresses on the internet.

2. The SBC Affiliates are: Ameritech Business Communications Services, Ameritech Advanced Data Services, Nevada Bell Telephone Company (SBC Nevada), Southwestern Bell Telephone, L.P. (SBC Texas), Illinois Bell Telephone Company (SBC Illinois), Indiana Bell Telephone Company Incorporated (SBC Indiana), Michigan Bell Telephone Company (SBC Michigan), The Ohio Bell Telephone Company (SBC Ohio), Wisconsin Bell, Inc. (SBC Wisconsin), Pacific Bell Telephone Company (SBC California), and The Southern New England Telephone Company.

3. The Debtors were also parties to thousands of other executory contracts and unexpired leases of non-residential real property with other entities in connection with their telecommunications lines and circuitry.

4. The BellSouth tariff language stated:

"[I]n order to safeguard its interest * * * [the Telephone Company may] require a customer which has a proven history of late payments * * * or does not have established credit to make a deposit * * * **to be held by the Telephone Company as a guar-**antee **of the payment of rates and charges**. * * * At such time as the provision of the service to the customer is terminated, **the amount of the deposit will be credited to the customer's account and any balance which may remain will be refunded.** (emphasis added).

The SBC Affiliates tariff language stated:

"At such time as the provision of the service to the customer is terminated, the amount of the deposit will be credited to the customer's account and any credit balance which may remain will be refunded. Such a deposit will be refunded or credited in any event when the customer has established credit or after the customer has established a one-year prompt payment record at any time prior to the termination of the provision of the service to the customer."

Similarly, the relevant, and virtually identical language the Carriers used with respect to the Pre–Petition Deposits stated:

"The Company will, in order to safeguard its interest * * * require an IC which has a proven history of late payments * * * or does not have established credit to make a deposit * * * **to be held by the Company as a guarantee of the payment of rates and charges**. * * * At such time as the provision of the service to the IC is terminated, **the amount of the deposit will be credited to the IC's account and any credit balance which may remain will be refunded."** (emphasis added).

approximate amount of $740,000 (the "Pre–Petition Deposits").

Three months after the Filing Date, the Debtors sold all of their assets to Level 3 Communications, Inc. and Level 3 Communications, LLC. (collectively, "Level 3"). Pursuant to the purchase agreement, Level 3 designated which telecommunications lines it intended to assume. Certain lines from each of the Carriers were designated and the Debtors served the Carriers with assumption notices listing the estimates of the cure payments the Debtors calculated were due and owing pursuant to Code § 365. In making their calculations, the Debtors deducted the amount of the Pre–Petition Deposits. In the case of Bell-South, the Debtors stated they owed no cure payment and in the case of The SBC Affiliates, the Debtors estimated that they owed approximately $1.1 million. Bell-South has asserted claims in these Chapter 11 cases of over $8 million, $1.5 million of which relates directly to the Debtors cure obligations and The SBC Affiliates have asserted claims of over $3 million, $1.3 million of which relate directly to the Debtors cure obligations.

At issue is whether the Debtors are entitled to use the Pre–Petition Deposits to offset their post-petition cure obligations. In a word, the answer is no.

## DISCUSSION

The right of setoff is a remedy as old as bankruptcy itself.[5] Its initial recognition in American bankruptcy law was in the Act of 1800 and it has been incorporated into every one of the Nation's subsequent bankruptcy acts[6], as well as the current Bankruptcy Code.

■ In essence, the right of setoff "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *Citizens Bank v. Strumpf,* 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). It is a remedy rooted in equity, the allowance or disallowance of which rests within the sound discretion of the bankruptcy court. *Bohack Corp. v. Borden, Inc.,* 599 F.2d 1160, 1165 (2d Cir.1979); *In re WorldCom,* 304 B.R. 611, 619 (Bankr.S.D.N.Y.2004).

From its earliest incarnation, the central tenet of the doctrine of setoff has been the mutuality of obligations—- that is, something must be "owed" by each party, acting in the same capacity. 4 Lawrence King, *Collier on Bankruptcy* ¶ 68.04 (14th ed.1988). Hence, pre-petition obligations have been setoff against pre-petition obligations and post-petition obligations against post-petition obligations. Traditionally, there has been no crossover of claims because the debtor and the debtor-in-possession are two separate and distinct entities which act in different capacities pre-and post-petition. *See Shopmen's Local 455 v. Kevin Steel Products, Inc.,* 519 F.2d 698, 704 (2d Cir.1975).[7]

**5.** In 1645 the first statute permitting a setoff was enacted in Virginia and in 1705 a statutory setoff was first allowed in a bankruptcy act. 4 Anne, c. 17, sec. 11.

**6.** *See* § 42 of the Bankruptcy Act 1800, § 5 of the Bankruptcy Act of 1841, § 20 of the Bankruptcy Act of 1867 and § 68 of the Bankruptcy Act of 1898, as amended. § 68(a) of the 1898 Act provided:

"in all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

**7.** *See also In re Braniff Airways, Inc.,* 42 B.R. 443, 449 (Bankr.N.D.Tex.1984); *In re Shoppers Paradise, Inc.,* 8 B.R. 271, 277–78 (Bankr.S.D.N.Y.1980); In re Hill, 19 B.R. 375, 380 (Bankr.N.D.Tex.1982); *Framingham Winery, Inc. v. J.A.G., Inc.,* 7 B.R. 624, 626–27 (Bankr.D.Mass.1980).

### No Crossover of Claims

Code § 553 addresses a creditors right of setoff and provides in relevant part, and with certain exceptions, that

"* * * this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor to the debtor that arose before the commencement of the case * * *."[8] (Emphasis added).

■ As was the case under the former Bankruptcy Act, it is not required under Code § 553 that the claim and debt being setoff be of the same character; they may arise from different transactions as long as there is a mutuality of obligations. *Lines v. Bank of America Nat'l Trust & Sav. Ass'n,* 743 F.Supp. 176, 182 (S.D.N.Y.1990); *Shoppers Paradise,* 8 B.R. at 277; *In re Westchester Structures, Inc.,* 181 B.R. 730, 739 (Bankr.S.D.N.Y.1995). Thus, pre-petition obligations may only be setoff against one another. *Cumberland Glass Mfg. Co. v. De Witt,* 237 U.S. 447, 35 S.Ct. 636, 59 L.Ed. 1042 (1914); *Braniff,* 42 B.R. at 449. Similarly, post-petition obligations may only be offset against one another. *Shoppers Paradise,* 8 B.R. at 277.

The Carriers argue that under the Code a pre-petition obligation may not be setoff against a post-petition obligation because of the lack of mutuality. They also argue that the Debtors have no right to apply the Pre–Petition Deposits against their outstanding cure obligations—— that because the Pre–Petition Deposits were specifically provided as security under federal tariffs, until the purpose for which the Pre–Petition Deposits were made has been fulfilled, *they* are the ones entitled to apply the Pre–Petition Deposits to any outstanding charges which are not paid in full out of the Debtors' estates.

■ Because Code § 553 specifically addresses a creditor's right of setoff with its attendant restrictions, the Debtors argue that Code § 558 governs the instant matter and that the limitation placed on the mutuality of obligations under Code § 553 does not apply when it is the debtor who is seeking the setoff. The court, however, finds Code § 558 irrelevant to the determination of this matter.

Code § 558 provides that

"[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes of frauds, usury, and other personal defenses. A waiver of any such defense by the debtor after the commencement of the case does not bind estate."

This is not a case where the Debtors are asserting any of their pre-petition defenses. Rather, they assert a post-petition right to offset cure obligations with the Pre–Petition Deposits in an attempt to deny the Code § 553 rights of the Carriers to set off the Pre–Petition Deposits against the pre-petition obligations owed by the Debtors.

■ The Debtors have made the novel argument that the offset should be allowed because their cure obligations merely constitute "two general unsecured prepetition obligations, the prepetition portion of the cure amount on the one hand and a prepetition amount due to the Debtors [from the

8. A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, natural, unnatural, disputed, undisputed, legal, equitable, secured, or unsecured * * *." Code § 101(4). A "debt" is defined as "a liability on a claim." Code § 101(11).

Carriers]." The court is baffled by this assertion.

■ Code § 365 clearly and plainly states that in order to assume a contract, a debtor is *required* to first cure all defaults, or provide adequate assurance that it will cure such defaults. Code § 365(b); *see also Adventure Resources, Inc. v. Holland,* 137 F.3d 786, 798 (4th Cir.1997) (when debtor assumed contract, "it undertook a legal obligation to cure existing defaults under that agreement, including any arrears"). The failure to comply with that legal obligation gives rise to a *post-petition* administrative claim that must be paid in full. *Id.* The Debtors' post-petition assumption of their executory contracts transformed the pre-petition claims of the Carriers once not cured, into new claims arising post-petition. *Id.* Under Code § 365, the Debtors are required to pay, or provide adequate protection, for these obligations.

Moreover, the court has found that none of the cases it has reviewed, whether cited by the parties or through its own research, addresses what this court deems a crucial factor in denying the pre/post-petition crossover of claims which the Debtors propose: that is that pre-petition dollars and post-petition dollars are considered differently under the Code. Under their plans of reorganization, debtors routinely pay fractional dividends, percentages on the dollar, to their pre-petition unsecured creditors. Post-petition administrative expenses are paid in full, 100¢ on the dollar. It is not fair, nor is it equitable, to allow the satisfaction of post-petition obligations with fractional dollars, rather than whole ones.

■ Finally, this is a matter where the Debtors tendered security deposits to the Carriers for the express purpose of protecting the rights of the very Carriers seeking the setoff. Accordingly, the Pre–Petition Deposits do not represent "debts" due and owing from the Carriers to the Debtors.[9] Indeed, the federal tariffs, as well as the contractual language in the Deposit agreements state specifically that the Pre–Petition Deposits were tendered as "guarantee of the rates and charges" incurred by the Debtors. Therefore the Pre–Petition Deposits are no different than any pre-petition security interest or lien held by a creditor and should be treated as such.

■ The court finds that the Debtors' have no greater rights to the Pre–Petition Deposits than the pre-petition Debtors did outside of bankruptcy. *See, e.g. In re Borison,* 226 B.R. 779, 786 (Bankr. S.D.N.Y.1998). Hence the Debtors have no right under Code § 558 or otherwise to use the Pre–Petition Deposits until the purpose for which they were given has been fulfilled: to safeguard each Carrier's interests and as a guarantee of the payment of rates and charges in the event of nonpayment by the Debtors.

Consequently, as provided by the applicable tariffs under which the Pre–Petition Deposits were tendered, until the Carriers are paid in full for all services provided to the Debtors, the Debtors have no right to the return of the Pre–Petition Deposits, and therefore, no ability to direct that the Pre–Petition Deposits be applied to reduce their cure obligations.

### The Equities Favor the Carriers

The Debtors final argument is that it would be unfair to permit the Carriers to setoff the Pre–Petition Deposits against their pre-petition claims. Unfortunately,

---

9. Given that the amounts the Debtors owe the Carriers far exceed, by millions of dollars, the amounts of the Pre–Petition Deposits, the court finds that the Pre–Petition Deposits do not represent an amount due and owing from the Carriers to the Debtors.

inequality is inherent in the very nature of setoff. *See In re Whimsy, Inc.*, 221 B.R. 69, 75 (S.D.N.Y.1998). The greater inequity, however, lies in the core of the Debtors argument. The very purpose of a security deposit is to protect the rights of a creditor in the event of the debtor's nonpayment. For the Debtors to be allowed to use the Carriers dedicated funds to enlarge the bankruptcy estate for distribution to all creditors would be grossly unfair.

### Conclusion

The Debtors have chosen to assume certain contracts with the Carriers and to assign them to Level 3. This decision comes with a price tag, namely payment by the Debtors of the full amount of the cure. For the reasons set forth above, the court holds that the Debtors are not entitled to use the Pre–Petition Deposits to satisfy their post-petition cure obligations.

The Debtors' motion is DENIED. Settle Order.