**In re LAWRENCE UNITED CORPORATION,**
**Debtor.**

**Bankruptcy No. 97–11297.**

United States Bankruptcy Court,
N.D. New York.

June 10, 1998.

Cooper, Erving, Savage, Nolan, & Heller, LLP, Albany, New York (Richard H. Weiner, of counsel), for debtor.

Ganje Law Office, Albany, New York (David L. Ganje, of counsel), for General Accident Insurance Company of America; GA Insurance Company of New York; The Camden Fire Insurance Association; General Assurance Company, Pennsylvania General Insurance Company; PG Insurance Company of New York; Potomac Insurance Company of Illinois.

Thorp, Reed & Armstrong, Pittsburgh, PA (Leonard F. Spagnola, of counsel), for General Accident Insurance Company of America; GA Insurance Company of New York; The Camden Fire Insurance Association; General Assurance Company, Pennsylvania General Insurance Company; PG Insurance Company of New York; Potomac Insurance Company of Illinois.

Roemer Wallens & Mineaux, Albany, New York (Elena DeFio Burke, of counsel), for The Monroe Group, Inc.

## MEMORANDUM–DECISION AND ORDER

ROBERT E. LITTLEFIELD, Bankruptcy Judge.

Presently before the court is a motion by The Monroe Group, Inc. ("Monroe") to compel General Accident Insurance Company of America and its Affiliates ("General Accident") to release to Monroe any and all commissions due pursuant to the June 4, 1997 order approving the sale of some of the Debtor's assets ("order"). Monroe also requests that the court direct General Accident to pay all future commissions provided for by the order.

### FACTS

The Debtor filed a Chapter 11 petition on February 28, 1997. Prior to filing bankruptcy, the Debtor was an agent of General Accident with offices in Rochester, N.Y. and Schenectady, NY. In its Schedule F, the Debtor listed General Accident's claims as

unsecured nonpriority claims.[1] General Accident filed a proof of claim on May 19, 1997.[2]

On May 15, 1997, the Debtor filed a motion pursuant to 11 U.S.C. ("Code") § 363(b) for authorization to sell all the insurance policy accounts and expirations related to its Rochester, N.Y. business operation and all of the furniture, fixtures, equipment and related personalty from that office. The Debtor also requested that the court authorize the sale of those assets "free and clear of all liens and other interests" with an effective date of March 1, 1998. In its timely-filed objection, General Accident argued that the sale should not include the commissions because they were not property of the estate under Code § 541(d) and they constituted cash collateral that entitled General Accident to adequate protection under section 363(e). General Accident suggested that the better way to handle the sale would be during the disclosure statement and plan confirmation proceedings when all creditors would have more complete information. It also pointed out that because the sale was contingent on Monroe receiving appointments as agent for the insurance companies that underwrite policies, a closing would not occur because General Accident would not appoint Monroe unless it received all of the collected premiums.

At the hearing on the sale motion, General Accident's counsel also raised a theory founded on a recoupment argument. Counsel referred to the "Agency Agreement" between the Debtor and General Accident. This agreement specifically covered the Debtor's Rochester business operation. General Accident directed the court's attention to Section II.f. of the agreement, arguing that the provision embodied its right of recoupment.[3]

The court overruled all objections to the sale, both written and oral, and entered the order. The order provided that the sale was "without prejudice to the rights of General Accident, if any, to assert a claim to the sale proceeds" and it deemed the sale effective as of March 1, 1997. The order also provided that Monroe was "entitled to receive all commissions and fees from all transactions related to the accounts of the Debtor's Rochester office with a billing date on or after March 1, 1997." At the time of the sale, General Accident was withholding commissions, but it is unclear whether the withheld commissions relate to the Debtor's Rochester office business operation and/or the Debtor's Schenectady office business operation.[4]

On June 13, 1997, General Accident filed an order to show cause requesting a temporary restraining order and a hearing to consider amending the sale order. In its supporting memorandum of law, General Accident argued that the order should expressly provide that the purchaser take the assets subject to its right of recoupment. On June 19, 1997, Monroe and the Debtor filed separate objections to the motion to amend. A hearing was held on June 20,

---

1. General Accident in Albany, New York and General Accident in Rochester, New York were the specific General Accident creditors listed in the schedule.

2. The basis for the claims were trust fund insurance premiums. Each of the General Accident affiliates listed its claim as a secured claim in the amount of $133,948.37 as of April 24, 1997. Commissions were listed as the collateral for the claims. The addendum attached to each proof of claim said that pursuant to the Agency Agreements, General Accident can recoup or setoff the commissions earned by the Debtor against the premiums the Debtor owes General Accident. Also, the addendum said General Accident had an unsecured or nonpriority claim for any deficiency after set-off or recoupment. According to General Accident, it cannot determine its secured and/or its general ("nonpriority") claims because it lacks sufficient information about the amount of premiums the Debtor owes it.

3. Section II.f. of the agreement provides that if the Debtor fails to pay premiums to General Accident, General Accident may apply commissions it owes the Debtor against the outstanding premiums. Section IV. refers to a commission schedule which General Accident later provided to the court. The schedule sets forth the commission percentages and the effective dates of the various insurance policies the Debtor sold; it does not change any terms of the agreement. The court notes that Section II.d. provides that General Accident shall prepare all monthly itemized statements of money due either party.

4. According to papers filed by General Accident's Associate General Counsel, the "Company has recouped to date $32,699.34 dollars from Debtor by way of debiting and retaining Commission payments otherwise due to Debtor." See Linda Hohn's affidavit dated June 12, 1997, ¶ 18.

1997. At the hearing the court stated that it saw no need to clarify the earlier order. The court recognized that it might have to resolve the recoupment issue at a later time and it stated if the order needed future clarification because of a position that one side or the other might take, it would not regard that as any sort of bad faith. For the court, a legitimate, future dispute over the order's provisions might exist.

As a result of the court's findings, General Accident withdrew its motion. Pursuant to the terms of the Asset Purchase Agreement, the Debtor sold its Rochester office assets to Monroe on or about July 28, 1997. After the sale occurred, General Accident refused to turnover the commissions covered by the order, prompting Monroe to file the instant motion.

## ARGUMENTS

Monroe asserts that General Accident currently holds $32,885 in commissions due for new, renewal or endorsement transactions with billing dates on or after March 1, 1997, commissions belonging to Monroe because the Rochester off-ice assets were sold "free and clear of all liens and other interests" pursuant to Code § 363(f). Monroe argues that General Accident's alleged right of recoupment is an "interest" extinguished by the order, citing Black's Law Dictionary definition of "interest" and case law where courts have held that section 363 covers more than just liens.

According to Monroe, property can be sold free and clear of interests in the property if the parties in interest receive notice of the sale. Monroe points out that General Accident was given notice of the sale as well as an opportunity to be heard through its involvement in the sale proceedings. Monroe argues that any claim that General Accident may have against the Debtor for collected premiums is an unsecured claim that may entitle General Accident to a distribution, particularly from the sale proceeds. Monroe asserts that although a trustee takes property subject to rights and equities in the property such as mortgages and security interests, that does not prevent the trustee from

selling the property free and clear of those interests pursuant to section 363(f).

Finally, Monroe argues that a creditor cannot withhold postpetition revenue it owes a debtor to satisfy an alleged prepetition debt. Monroe refers to General Accident's adversary proceeding to obtain premiums the Debtor collected. In that adversary, General Accident also seeks an accounting and an injunction to prevent the Debtor from converting and/or dissipating collected premiums. Monroe claims that until General Accident proves the Debtor owes it collected premiums, General Accident cannot exercise its alleged right of recoupment. Monroe believes that the court should not allow General Accident to unilaterally withhold the commissions until the court resolves the adversary proceeding.

General Accident contends that asserting its recoupment defense does not violate the sale order. It also asserts that Monroe's motion is moot because the order authorized the Debtor to sell its Rochester assets to Monroe, the closing took place, and the court has already expressly determined that General Accident's continuing retention of the commissions was not in violation of the sale order. General Accident challenges the court's subject matter jurisdiction, stating that there will be no impact on the Debtor or the estate and the dispute is between two non-bankruptcy parties over an asset that is no longer property of the estate. If the court decides that it has jurisdiction, General Accident requests that the court abstain from deciding the recoupment issue because it is based on state insurance law, state contract law and state common law, therefore, state courts are uniquely situated to resolve the matter. If the court does not abstain, General Accident asserts that the court should focus its inquiry on the contractual and common law right General Accident has and allow it to exercise its right of recoupment against the obligation it may have to pay the commissions it owes to the Debtor or that it owes to Monroe as purchaser. Finally, it argues that section 363(f) does not control here because its right of recoupment is not an "interest" and it cannot be compelled to

accept a money judgment for the collected premiums the Debtor never remitted.

In its reply brief, Monroe argues that General Accident's characterization of the court hearing on June 20, 1997 is "grossly inaccurate." It believes the court merely decided not to hold General Accident in contempt at that time; it did not decide that General Accident could continue to exercise its alleged right of recoupment. Monroe does not think its motion is moot, it does not agree that the court lacks jurisdiction and it does not want the court to abstain from deciding the issue. It reiterates that General Accident's alleged right of recoupment is an "interest" that was extinguished by the order except for whatever rights General Accident may have in the sales proceeds.

## DISCUSSION

### A. Jurisdiction

The court must first determine whether it has jurisdiction to hear this contested matter. Sections 157 and 1334 of Title 28 govern the bankruptcy court's subject matter jurisdiction. *Plaza at Latham Assocs. v. Citicorp North America, Inc.,* 150 B.R. 507, 510 (N.D.N.Y.1993). Section 1334(a) grants original and exclusive jurisdiction over all cases under Title 11 to the district courts and section 1334(b) provides that the district court shall have original but not exclusive jurisdiction of all civil proceedings arising under Title 11, or arising in or related to cases under Title 11. Under section 157(a), the district court may refer any or all cases under Title 11 and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11 to the bankruptcy judges for the district. This referral exists in the Northern District of New York pursuant to Local Rule of Practice for the United States District Court for the Northern District of New York 76.1. Under section 157(b)(1), bankruptcy judges may hear and determine all cases under Title 11 and all core proceedings arising under Title 11 or arising in a case under Title 11.

■ A bankruptcy court first looks to see if it has at least "related to" jurisdiction under section 1334(b). *See Wood v. Wood (In re Wood),* 825 F.2d 90, 93 (5th Cir.1987). In the Second Circuit, the bankruptcy court has "related to" jurisdiction if the resolution of the dispute has "any significant connection" to the debtor's bankruptcy.[5] *Turner v. Ermiger (In re Turner),* 724 F.2d 338, 341 (2d Cir.1983). In *Turner,* the debtor filed a complaint against her landlord, alleging that he converted personal property she kept on the leased premises. *Id.* at 339. The court held that because there was no suggestion that the trustee would receive the proceeds or that the debtor's failure to recover the claim could increase her exemption claim under Code § 522(d), there was no showing that the action had any "significant connection" to her case, thus, there was no "related to" jurisdiction. *Id.* at 341.

■ A significant connection can exist when a party seeks to enforce a bankruptcy court order. *Wards Co., Inc. v. Jonnet Dev. Corp. (In re Lafayette Radio Electronics Corp.),* 761 F.2d 84, 91–92 & n. 6 (2d Cir. 1985). The court distinguished *Turner* because the action in that case did not involve the enforcement of an order; it determined that the bankruptcy court had "related to" jurisdiction over the action to enforce its own judgment concerning a lease even though the lease was between nondebtors. *Id.* at 90, 92 & n. 6. When the bankruptcy court rendered the judgment, it expressly determined that the judgment terms were in the best interest of both the creditors and the estate. *Id.* at 91–92. Therefore, the court determined that the suit had "ample nexus" to the bankruptcy proceeding. *Id.* at 92.

The instant dispute involves a third party (Monroe) who seeks to enforce the terms of the court's order approving sale. The Debtor made a motion to sell estate property to avoid a further dissipation of its assets which the court approved because it was in the best interests of the creditors and the estate.

---

**5.** It appears that this test for determining "related to" jurisdiction is acceptable to the Supreme Court. *See Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n. 6, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995). Like the tests used in other circuits, it clearly states that bankruptcy courts have no jurisdiction over proceedings that do not effect the debtor.

However, the Debtor's estate has already received its full benefit from the sale since the closing has occurred. Unlike the estate in *Turner,* there appears to be little, if any, future income for this estate because while the debtor and the estate derived a continuing benefit from the sublease in *Turner,* the Debtor in this case has already received all of the sales proceeds. *Id.* at 91–92. Nevertheless, if the court were to determine that General Accident can recoup the premiums from the commissions in dispute, General Accident's claim against the Debtor for the premiums would be reduced, thereby affecting asset distribution and the Debtor's remaining liability on General Accident's claim. The motion also requires the court to determine what the sale included: the full amount of the commissions earned after March 1, 1997 or the commissions minus the amount of premiums collected by the Debtor but never remitted. If nothing else, the court has at least "related to" jurisdiction over this contested matter.

■ One final note on the jurisdiction issue: Generally, disputes between purchasers of a debtor's assets and third parties are not within the bankruptcy court's jurisdiction. *See, e.g., In re Hall's Motor Transit Co.,* 889 F.2d 520, 522–23 (3d Cir.1989) (holding that the bankruptcy court had no jurisdiction over an action by the purchaser of the debtor's property seeking to enjoin enforcement of a new zoning ordinance); *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.),* 910 F.2d 784, 789 (11th Cir.1990) (holding that the bankruptcy court had no jurisdiction over an action by the debtor's landlord against the purchaser of the property for failure to remove assets from the property). However, these cases are distinguishable because each only tangentially touched the bankruptcy proceeding and did not involve the sale order itself. *See In re Marcus Hook Dev. Park, Inc.,* 943 F.2d 261, 266 (3d Cir .1991) (holding that the bankruptcy court had subject matter jurisdiction over a proceeding brought by the purchaser of the debtor's property to interpret conflicting final orders of the court an order approving sale free and clear of liens and a subsequent order reimposing a lien on the sale property). As the court has already

determined, the present motion could impact the estate.

### B. Core versus Noncore

■ Next, the court must determine the scope of its jurisdiction. If a matter is a core proceeding, the bankruptcy court can enter orders and judgments, but in a noncore proceeding, the bankruptcy court can only submit proposed findings of fact and conclusions of law to the district court and the district court enters the order and judgment after considering the bankruptcy judge's submission and reviewing *de novo* timely objections. *See Plaza at Latham Assocs,* 150 B.R. at 511–12 (citing 28 U.S.C. §§ 157(b)(1) and 157(c)(1)). Noncore proceedings include matters otherwise related to the case under Title 11. 28 U.S.C. § 157(b)(3). In order to be a "core" proceeding, the matter must involve substantial rights created by Title 11 or arise only in bankruptcy. *See id.* at 514; *In re Wood,* 825 F.2d at 97. A court must look to the form and substance of a proceeding to determine whether core status exists. *See id.*

■ A debtor who seeks to sell property free and clear of all claims, interests and liens is asserting a substantive right based on Code § 363(f). *Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.),* 930 F.2d 1132, 1144 (6th Cir.1991). The debtor in *In re Wolverine Radio Co.* filed a motion on behalf of the assignee of the purchaser of the debtor's broadcasting equipment, radio tower and radio license, invoking the substantive right created by section 363(f) and asking the bankruptcy court to enforce the order that provided for the sale of the debtor's assets "free and clear of any mortgages, liens, pledges, charges, security agreements, claims or encumbrances." *Id.* at 1135–37. After finding that the debtor's indemnification agreement intertwined with the controversy involving the assignee and the state employment security commission gave the court "related to" jurisdiction under 28 U.S.C. § 1334, the court went on to conclude that the debtor's motion was a core matter because it arose in a bankruptcy proceeding during the dischargeability of debts and plan confirma-

tion phase and because the debtor was asserting substantive right provided by section 363(f). *Id.* at 1145.

Although this contested matter is similar to a motion to sell assets free and clear of liens and interests, Monroe attempts to invoke Code § 363(f), a substantive right belonging to the debtor-in-possession/trustee, not the purchaser. 11 U.S.C. §§ 363(f), 1107(a). However, the matter before the court is unique. The parties have different interpretations of the order's effect based on statements the judge made during the hearing on the motion to amend the order. This aspect of the dispute could arise only in a bankruptcy proceeding. Furthermore, the order not only concerns the property sold and the proceeds received, it also involves the Debtor's liability to General Accident and ultimately the distribution to all creditors. Therefore, the matter before the court is a "core" proceeding because it arose in a case under Title 11. *In re Wolverine Radio Co.,* 930 F.2d at 1145.

### C. Moot or Justiciable?

General Accident mistakenly believes the court already decided the recoupment issue during the June 20, 1997 hearing. The record shows that the court merely decided that a genuine issue of fact and/or law regarding the sale existed. The court found that a reasonable argument could be made by either side; it did not determine that General Accident was the winner of the dispute. Thus, issues surrounding the order are not moot.

### D. Voluntary Abstention

 A bankruptcy court may abstain from hearing a bankruptcy proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law." 28 U.S.C. § 1334(c)(1). A court should abstain when unusual questions of state law exist. *Coker v. Pan Am. World Airways, Inc. (In re Pan Am. Corp.),* 950 F.2d 839, 846 (2d Cir.1991). Some courts have noted that if the matter is a core proceeding, the bankruptcy court should not abstain. *E.g., Steinberg v. Esposito (In re Pio-*

*neer Dev. Corp),* 47 B.R. 624, 628 (Bankr. N.D.Ill.1985).

The contested matter before the court is a core proceeding. Because the question before the court concerns the court's own order and various bankruptcy courts and their respective appellate courts have considered the right of recoupment in a bankruptcy context, no "unusual" issue of state law exists.

### E. The section 363(f) order

 The order provides for the sale of the Debtor's Rochester office assets "free and clear of all liens and other interests." General Accident's alleged right of recoupment does not qualify as a "lien," thus, the question is whether its right is an "interest" for section 363 purposes.

A "trustee may sell property under subsection (b) or (c) of this section *free and clear of any interest in such property* of an entity other than the estate" only if one of the five conditions are met. 11 U.S.C. § 363(f) (emphasis added). Unfortunately, "courts have not yet settled upon a precise definition of the phrase 'interest in such property.'" *United Mine Workers of Am.1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573, 581 (4th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 1251, 137 L.Ed.2d 332 (1997). A narrow interpretation of the statute limits the phrase "interest in such property" to *in rem* interests which have attached to the property, i.e., liens and security interests. *See Fairchild Aircraft Inc. v. Campbell (In re Fairchild Aircraft Corp.),* 184 B.R. 910, 917–18 (Bankr.W.D.Tex.1995). Another view is that an "interest" in property attaches "to the property so as to cloud its title." *In re Wolverine Radio Co.,* 930 F.2d at 1147 (holding that the debtor's experience rating was not an "interest" in the debtor's property). One court has stated that the statute should not be interpreted so broadly that it includes anyone who has a general right to payment from the debtor and it should not be interpreted so narrowly that it only includes *in rem* interests. *In re Leckie Smokeless Coal Co.,* 99 F.3d at 582 (emphasis added). The Fourth Circuit also stated that creditors holding unsecured claims do not have an interest in the property of the estate even

though they have a claim against the estate. *Id.* at 581.

The Second Circuit has not defined an "interest" in property for purposes of Code § 363(f) and neither the parties nor the court found cases discussing recoupment as an "interest" in property. Recoupment and set-off rights are usually determined by state law. *New York State Elec. & Gas Corp. v. McMahon (In re McMahon)*, 129 F.3d 93, 96 (2d Cir.1997). According to the Second Circuit, "[r]ecoupment means a deduction from a money claim through a process whereby cross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered." *Id.* (quoting *Nat'l Cash Register Co. v. Joseph*, 299 N.Y. 200, 203, 86 N.E.2d 561 (1949)).

In *In re Leckie Smokeless Coal Co.*, the plan/fund had a right to collect premiums from the debtor because federal legislation provided that coal mine operators must contribute to the plan/fund. *In re Leckie Smokeless Coal Co.*, 99 F.3d at 581. Because the debtor was a coal mine operator, the district court concluded that since the plan/fund had statutory claims against the debtor for future premium payments, it had an interest in the debtor's property. *Id.* The Fourth Circuit agreed, not because of the plan/fund's right to demand money from the debtor, but because the right derived from the fact that the debtor put its assets to use in the coal mining industry. *Id.* at 581–82. Had the debtor chosen to use the assets for another purpose, the plan/fund would not have had the right to demand payments. *Id.* at 582.

■ The term "interest" is intended to refer to obligations that are connected to, or arise from, the property being sold. *See* 3 COLLIER ON BANKRUPTCY ¶ 363.06[1], at 363–45 (Lawrence P. King ed., 15th ed. rev.1997). The bankruptcy court in Eastern Virginia has considered a state statute which provided that a state agency had the right to recapture depreciation from operators of nursing homes if the operators realized a gain on the sale of their real property. In *P.K.R. Convalescent Ctrs., Inc. v. Commonwealth of VA, Dep't of Med. Assistance Serv. ("In re P.K.R. Convalescent Ctrs., Inc."*), 189 B.R. 90 (Bkrtcy.E.D.Va.1995). The state statute also provided that the state agency had a right to pursue the purchasers if the operators failed to reimburse the state. *Id.* at 91. The court found the state agency's right to recapture depreciation from the debtor, an operator of a nursing home, to be an "interest" in property because its right was tied to the sale of the real property. *Id.* at 94.

■ Both *In re Leckie Smokeless Coal Co.* and *In re P.K.R. Convalescent Ctrs. Inc.* are distinguishable. In both of those cases, the purchase and subsequent ownership of the estate property resulted in someone's (the purchaser's) liability. The instant matter does not center on the purchase and subsequent ownership in the same way; it centers on what Monroe purchased, not what "purchaser liabilities" resulted from the purchase. Any right of recoupment that General Accident has derives from the collected premiums the Debtor owes to General Accident arising from the same transaction or set of transactions involving the commissions General Accident owes to the Debtor. The right of recoupment is not itself a claim and any right of recoupment General Accident may have does not even fall under the broadest interpretation of an "interest" in property. Under common law, the right of recoupment is a defense to the debtor's claim against the creditor; it is not a mutual obligation. *Mercy Hosp. of Watertown v. N.Y. State Dep't. of Soc. Serv.*, 171 B.R. 490, 494 (N.D.N.Y.1994); *See In re McMahon*, 129 F.3d at 96. Thus, General Accident's alleged right of recoupment is not an "interest" in property for section 363(f) purposes.

F. The right of recoupment

■ As stated above, the right of recoupment is a defense, not a mutual obligation. The bankruptcy court must look to state law for guidance on whether an entity possesses a right of recoupment. *In re McMahon*, 129 F.3d at 96. As mentioned earlier, New York State's highest court has defined recoupment as "a deduction from a money claim through a process whereby cross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered." *Nat'l Cash Register Co.*, 299 N.Y. at 203, 86 N.E.2d 561. The Second Circuit has also allowed recoupment to occur when it arises "out of the same set of transactions as the

claim." *In re McMahon,* 129 F.3d at 97 (emphasis added).

General Accident's agreement with the Debtor covering the Rochester, N.Y. office essentially covered **all** transactions between these two, particularly, the Debtor's ability to sell General Accident insurance policies and its concurrent obligation to collect and remit premiums related to those policies, together with General Accident's obligation to pay the Debtor commissions it earned on those policies. Because it embodied their entire relationship with respect to the Debtor's Rochester office operations, this court cannot automatically conclude that General Accident has a right of recoupment that it can assert against any and all commissions it owes the Debtor. Although the court in *Paris v. Transamerica Insurance Group (In re Buckley & Associates Insurance, Inc.)* did point out that because two contracts existed a single transaction did not exist, thus, the creditor did not have a right of recoupment, that court did not say that if only one contract had existed, the creditor necessarily could have exercised a right of recoupment. *In re Buckley & Assoc. Ins., Inc.,* 78 B.R. 155–57 (E.D.Tenn.1987). In fact, that court agreed with the line of cases where courts have held that a creditor cannot withhold postpetition earnings owed to the debtor due to the debtor's postpetition efforts in order to satisfy a prepetition debt. *Id.* at 158.

The cases General Accident cites in its memorandum of law are distinguishable because they involved an overpayment/advance situation (e.g., *Wineburg v. Knights of Columbus ("In re Sherman"),* 627 F.2d 594 (2d Cir.1980)), a reimbursement situation (e.g., *Mercy Hosp. of Watertown* ) or a deposit situation (e.g., *In re McMahon* ), situations where the creditor has already performed and the debtor must either render services directly related to payments the creditor already made (overpayment/advance and reimbursement situations) or pay for services the creditor already rendered (deposit situation). Here, mutual obligations exist and those obligations span two time periods: General Accident only owes the Debtor commissions for insurance policies the Debtor sold postpetition and the Debtor owes General Accident insurance premiums it collected prepetition. If General Accident had advanced commissions on policies the Debtor had not yet sold, then General Accident's alleged right of recoupment would fall squarely within the parameters discussed in *In re Sherman.* But this is not a *Sherman* situation because General Accident never "overpaid" or "advanced" the Debtor's commissions.

This case also does not fall within the parameters of the Medicaid overpayment cases (e.g., *Mercy Hosp. of Watertown).* Those cases involved a federal statute which provided for a right to recoup medicaid overpayments by adjusting future reimbursements. But even in the *Mercy Hosp. of Watertown* case, the court pointed out that the adjustment in question must relate to reciprocal obligations arising from the same transaction (or series of transactions) and remanded the matter for an actual investigation of the content of the contracts presumed to be part of the same transaction. *Mercy Hosp. of Watertown,* 171 B.R. at 496.

As for the recent Second Circuit opinion, the court dealt with the one account the debtor had with Niagara Mohawk, it reviewed New York law limiting the utility's recoupment to a prescribed deposit and it compared the matter to an overpayment situation. *In re McMahon,* 129 F.3d at 97. Nothing in the record before this court shows that General Accident refuses to turn over the disputed commissions because it has "overpaid" commissions to the Debtor, rather, General Accident seeks to holdback the commissions in order to recover the premiums related to the policies the Debtor sold pre-petition. Any assertions that General Accident has made or may make to the contrary are or would be mere allegations. The agreement provides at Section II.d. that General Accident was supposed to prepare monthly itemized statements of money due to it or due to the Debtor and, since there is no evidence of a contrary arrangement, it appears that if General Accident could have presented something more than a mere allegation, it would have done so.

Also, because this is not a similar time-frame situation (prepetition premiums and commissions earned prepetition and/or postpetition premiums and commissions earned postpetition), this case is further distinguishable from *In re McMahon.* The Second Circuit specifically stated it was not address-

ing whether a utility could apply a prepetition deposit against a debtor's postpetition obligations. *Id.* at 99; *See also Nat'l Cash Register Co.*, 299 N.Y. at 203, 86 N.E.2d 561 (Court of Appeals held that vendor could plead right of recoupment against the city for taxes of same type which the vendor had erroneously paid to the comptroller in the same period). Finally, the court likened Niagara Mohawk to an involuntary creditor because of the specific state laws governing utilities. *In re McMahon*, 129 F.3d at 97. This court cannot make a similar finding because General Accident chose to enter into a contract with the Debtor and, for whatever reason, decided to continue their contractual relationship even after the Debtor stopped remitting premiums. General Accident is an "ordinary creditor" who seeks relief insofar as its actions are more like a creditor who "consciously made a loan, extended credit, or made payments required by a contract." *See id.*

The disputed commissions relate to postpetition policies and General Accident wants to exercise a right of recoupment to recover premiums related to prepetition policies. Nothing in the record shows that the Debtor (or Monroe for that matter) failed to turnover premiums related to policies it sold postpetition. Although any right of recoupment General Accident may have might be properly exercised if General Accident withheld commissions directly related to those policies General Accident seeks premiums for, a different result occurs if the court were to allow General Accident to holdback commissions earned post-petition and related to post-petition policies the Debtor sold, collected premiums for and then remitted to General Accident. That scenario would allow General Accident, in effect, to collect the prepetition premiums the Debtor never remitted from moneys legitimately owed to the Debtor because of its post-petition efforts, and, more importantly, where the Debtor had not failed to remit the premiums. Such a result would enable General Accident to receive better treatment than other general, unsecured creditors, a result inconsistent with one of the Code's canons: equal treatment for similarly-situated creditors.

As determined above, General Accident does not have an "interest" for purposes of section 363(f). The court further finds that it does not have a right of recoupment against the commissions earned postpetition, thus, it also does not have a legitimate defense to Monroe's motion to enforce the order. The court cautions the parties, however, that this determination only covers commissions related to the Debtor's Rochester business operation since any commissions owed to the Debtor because of the agency agreement covering the Debtor's Schenectady business operation were not covered by the order.

Based on the foregoing, it is hereby

ORDERED that Monroe's motion to compel General Accident to turn over commissions covered by the court's order approving the sale of the Debtor's Rochester office assets is hereby GRANTED; and,

It is further ORDERED that General Accident shall refrain from withholding future commissions due and owing to the extent said commissions are provided by the order approving the sale of the Debtor's Rochester office assets.